904 So.2d 583 (2005)
I.R., Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellee.
No. 3D04-2725.
District Court of Appeal of Florida, Third District.
June 15, 2005.
*584 Kenneth M. Kaplan, for appellant.
Calianne P. Lantz; and Hillary S. Kambour, for appellee.
Before GERSTEN, FLETCHER, and RAMIREZ, JJ.
*585 RAMIREZ, J.
I.R., the natural mother, appeals the trial court's order terminating her parental rights as to her minor child, C.R., pursuant to section 39.806(1)(c), Florida Statutes (2003). We reverse because the trial court's finding that the mother's continuing involvement with the child threatened the child's well-being or life pursuant to section 39.806(1)(c), Florida Statutes (2003), was not supported by clear and convincing evidence.
The minor child came into state care on October 27, 2002. The detention petition filed in November 2002 alleged that the mother was hospitalized for mental illness, that the father's whereabouts were unknown,[1] that the mother's mental health condition caused her to neglect the child, and that the child was not clean or properly groomed. The child was placed in the custody of her maternal aunt and uncle.
On July 1, 2003, a dependency order was entered finding that the mother had been involuntarily committed because she refused to take her medications and that this "significantly interfered with her ability to care for her child, thereby placing the child at risk of harm." An order accepting a case plan for the mother was signed by the court on August 6, 2003. Less than two months later, on October 3, 2003, the Department filed a petition to terminate the mother's parental rights, alleging that she suffered from mental illness and failed to recognize, seek services for and treat this mental illness, despite having been provided services by the Department. In February 2004, the dependency court found the mother in overall partial compliance with her case plan.
The adjudicatory hearing on the petition was held on April 15, 16, June 21 and June 22, 2004. The testimony showed that the mother graduated from law school in 1999. She was unemployed and was receiving disability payments for her mental illness. The mother admitted that she had been told by her treating physician that she had a chemical imbalance and that she could be suffering from depression. She first sought treatment in the summer of 1999, and was given Risperdal, an antipsychotic medication. Later in 1999, she was hospitalized again. In October 2002, she was hospitalized and Baker Acted. She was then hospitalized again in March 2003, when she was Baker Acted and sent to Jackson Memorial Hospital, where she stayed for about 31 days.
After taking testimony from the mother, a mental health counselor, and a maternal aunt, the court commented on the lack of evidence regarding a diagnosis for the mother. The court was not sure if the mother had an illness or not. The court stated that all the Department had presented was a hospital record from one of the times when the mother was Baker Acted but that the Department had not presented a diagnosis or prognosis of the mother's mental health condition. The court concluded that the mother should have a psychological and psychiatric evaluation during the month-long break in trial.
When the trial resumed, Dr. Eugenio Rothe, who had during the interim performed a psychiatric evaluation on the mother at the trial court's request, testified that she suffered from bipolar disorder and had a psychotic break. He stated that the mother was above average in intelligence, *586 cooperative and motivated to get better. His concern was that she was not attending any kind of psychotherapy, but only medical management visits very sporadically. Dr. Rothe testified that the mother did not understand the seriousness of her condition but did understand that she had a condition. He thought it would be very important for her as part of her recovery, and to prevent any relapses in the future, to have regular visits with a mental health professional that could help her deal with her illness. Dr. Rothe opined that the mother potentially would be able to parent appropriately but needed regular psychotherapy so she could learn more about her condition, learn how to handle it, learn how to prevent a relapse, and in the process, protect her child. Specifically, he stated that if the mother became familiarized with the presenting symptoms that antecede a crisis, she would be more able to get immediate psychiatric attention before having another relapse. He opined that the mother currently had no mental health support.
The guardian ad litem assigned to the case testified that she only spoke once with the mother over the phone. She had never met her nor observed the mother's interactions with the child during visitations. Yet the guardian ad litem concluded that the mother was incapable of safely caring for the child due to her mental illness. She stated the child was appropriately placed and was bonded with her aunt, uncle and cousins.
The child's father testified from prison that he believed the child would want to be with the mother. The mother then testified again and stated she was in favor of receiving treatment, as Dr. Rothe recommended, and that she understood treatment was necessary when she was not in crisis. She stated she was willing to follow the recommendations of the doctor and "embraced" the results of Dr. Rothe's report.
A final judgment terminating the mother's parental rights was rendered in August 2004 by the trial court. The court found that the mother continued to engage in conduct that threatened the health and/or safety of the child despite the provision of services pursuant to section 39.806(1)(c), Florida Statutes (2003). The court found that the mother was in denial of her mental illness and that she failed to comply with or benefit from the services provided to her and thus, posed a continuing risk to the child. The court thus found it was in the manifest best interests of the child that the mother's parental rights be terminated.
The trial court terminated the mother's parental rights pursuant to section 39.806(1)(c), Florida Statutes (2003), under which the court can terminate parental rights "[w]hen the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services." This finding requires clear and convincing evidence that the parent suffers from a condition that makes probable the prospect of future abuse or neglect of a child and that the condition was one which was likely to continue. See W.R. v. Dep't of Children and Family Serv., 896 So.2d 911, 913 (Fla. 4th DCA 2005). We find the record inadequate in this case to support termination on this ground.
In the final judgment, the court found that the mother failed to benefit from the services she received, that she failed to comply with the services provided to her by the Department, and that she failed to comply with the case plan. Contrary *587 to these findings, the evidence indicates that the Department filed the termination of parental rights petition without really giving the mother the opportunity to complete her case plan. The mother's case plan was approved on August 6, 2003, and the termination of parental rights petition was filed October 3, 2003. Although we are aware that under section 39.806(1)(c), Florida Statutes, there is no twelve-month period requirement in order to complete a case plan as is provided in section 39.806(1)(e), we believe that termination here was still unwarranted.
Section 39.806(1)(c) provides that termination is warranted when the parent continues to engage in conduct that is harmful to the child, despite the provision of services. See In re C.W.W., 788 So.2d 1020, 1023 (Fla. 2d DCA 2001). The court found that the mother had been diagnosed with paranoid schizophrenia and/or bi-polar disorder. While Dr. Rothe testified that she suffered from bipolar disorder and that she had had a psychotic break, he never stated that the mother suffered from paranoid schizophrenia.
The court also found that the mother was in denial of her mental health illness and that this threatened the well-being of the child. Because there had been no diagnosis of the mother by a mental health expert before the trial began, the Department could not have provided the mother with the services she needed in order to improve. At the beginning of the trial, the mother may have been in denial of her situation because that is a symptom of her bi-polar disorder. However, after the evaluation by Dr. Rothe, the mother accepted the bi-polar diagnosis. She stated she was in favor of receiving treatment at least once a week and she understood and "embraced" the results of Dr. Rothe's report. Dr. Roth's testimony lends support to the mother in that he found her to be cooperative and motivated to get better. While she did not appreciate the seriousness of her condition but she did understand that she had a condition. He also opined that she potentially would be able to parent appropriately. The trial court made no reference in the final judgment to Dr. Rothe's psychological and psychiatric evaluation which the trial court itself had requested. The trial judge erred in terminating the mother's parental rights under section 39.806(1)(c) when improvement was possible according to the mental health expert, if the mother was offered the proper treatment, which the Department could not have done because they did not have a proper diagnosis until after the termination of parental rights petition was filed.
In addition, the evidence presented does not demonstrate that the mother's risk of future neglect is high. On the contrary, the testimony from Dr. Rothe indicates that with the proper psychotherapy, the mother will have the tools she needs to manage her disorder and prevent future psychotic breaks. Clearly, the Department failed to establish here that long-term therapy would not have improved the mother's mental health condition. The Department's failure to identify the mother's condition prior to trial may account for the lack of reasonable efforts and services.
The mother had taken steps to comply with the case plan, improve her skills and situation. She was referred to complete a psychological evaluation, which she did in August 2003. She attended the 16-week parenting program in September 2003 and finished with a certificate of completion. She enrolled in the anger management course and began in November 2003, and she enrolled in the domestic violence course. She was living with her mother, the child's maternal grandmother, which was never found to be inadequate. The *588 child has not been re-neglected since she was removed in October 2002. All of the allegedly neglectful conduct on the part of the mother predated the dependency order.
The burden of proof is on the Department to prove by clear and convincing evidence that a termination of the parent's rights is the least restrictive means of protecting a child from harm. See J.F. v. Dep't of Children and Families, 890 So.2d 434, 441 (Fla. 4th DCA 2004). The Department is required to prove all the elements in section 39.810 to determine whether it is in the manifest best interests of the child to have the parent's rights terminated. In this case, the Department failed to prove that the manifest best interests of the child would be served by terminating the mother's parental rights. The Department did not make reasonable efforts to reunify the mother, nor did the Department provide the appropriate services. The Department did not prove its case by clear and convincing evidence. Accordingly, we reverse the termination of parental rights and remand the case to the trial court. See P.A. v. Dep't of Health and Rehab. Servs., 685 So.2d 92 (Fla. 4th DCA 1997). On remand, the trial court may consider less restrictive alternatives to termination, such as placing the minor child in the long-term custody of the maternal aunt and uncle, and offering the mother a new case plan that addresses the recommendations made by Dr. Rothe.
Reversed and remanded.
NOTES
[1] The father was thereafter located in a federal penitentiary in South Florida, where he was serving a 108-month sentence for possession and distribution of cocaine. During the pendency of the TPR trial, he was transferred to Atlanta, then South Carolina. The father had already served two years and was awaiting resentencing for cooperating with the government. The mother is still married to him.