# Third District Court of Appeal

## State of Florida

Opinion filed February 24, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2401
Lower Tribunal No. 14-15719
_____

**M.C., the mother,**
Appellant,

vs.

**Department of Children and Families, et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Maria Sampedro-Iglesia, Judge.

Eugene F. Zenobi, Criminal Conflict and Civil Regional Counsel, Third Region, and Kevin Coyle Colbert, Assistant Regional Counsel, for appellant.

Karla Perkins, for appellee Department of Children and Families; Laura J. Lee (Sanford), for appellee Guardian ad Litem Program.

Before ROTHENBERG, EMAS, and FERNANDEZ, JJ.

ROTHENBERG, J.

M.C. ("Mother") appeals from a final judgment terminating her parental rights to her children G.C. and E.C. (collectively, "the Children") under section 39.806(1)(f), Florida Statutes (2015).[1]  Because there is no clear and convincing evidence in the record to support the termination, we reverse.

## I.  PROCEDURAL HISTORY

In June 2014, the Department of Children and Families ("Department") obtained a shelter order as to both G.C., who was then eleven years old, and E.C., who was then eight years old and has a severe developmental disability. Thereafter, in July 2014, the Department filed a verified petition for dependency, stating, in part, that services are not appropriate because no voluntary services

[1] Section 39.806(1)(f) provides as follows:

> (1)  Grounds for the termination of parental rights may be established under any of the following circumstances:
>
> . . . .
>
> (f)  The parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling. Proof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required.
>
> 1.  As used in this subsection, the term "sibling" means another child who resides with or is cared for by the parent or parents regardless of whether the child is related legally or by consanguinity.
>
> 2.  As used in this subsection, the term "egregious conduct" means abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.

2

could be instituted while also ensuring the safety of the Children, who are at substantial risk of imminent harm, neglect, and/or abuse.

In September 2014, the Department filed a petition to terminate the Mother's parental rights as to both G.C. and E.C., asserting that the Department was proceeding directly to termination pursuant to section 39.806(1)(f) due to the egregious nature of the alleged abuse, abandonment, or neglect. Because the Department sought termination under section 39.806(1)(f), the Department did not, and was not required to, make "reasonable efforts to preserve and reunify" the family. § 39.806(2), Fla. Stat. (2015).

Although the petition to terminate made allegations as to both G.C. and E.C., the Department limited its presentation and proof to the allegations regarding E.C. The petition alleges that the Mother took E.C. to the hospital on June 15, 2014, with second degree, caustic, liquid burns over his lower back, buttocks, right shoulder, and to the right side of his body. Although the Mother stated that she believes that G.C. inflicted E.C.'s burns based on an incident that occurred the night before, she was not able to provide a "cohesive explanation" as to how the burns occurred.

## II. TESTIMONY PRESENTED AT THE ADJUDICATORY HEARING

At the adjudicatory hearing on the petition to terminate the Mother's parental rights, the Department called several witness, including the Mother and

3

Dr. Jefry Biehler, a physician who consults with the Child Protection Team.

## A. The Mother's testimony

The Mother testified that she was a licensed foster care provider from 1996 to 2011, she has fostered approximately fifteen children, and she has adopted three of these foster children—G.C., E.C., and K.C. G.C., who was born on October 23, 2003, was placed with the Mother when he was three months old and adopted by her when he was two years old. E.C., who was born on January 20, 2006, was placed with the Mother when he was six months old after his biological father inflicted a severe brain injury upon E.C. that required E.C. to undergo brain surgery, and the Mother adopted E.C. when he was three years old. E.C. suffers from cerebral palsy, is non-verbal, and has severe disabilities. K.C. moved away as a teenager to live with her biological family. In addition to her adopted children, the Mother has an adult daughter, R.C., who was living in the family home when E.C. sustained his burns in mid-June 2014.

In 2013, G.C. was diagnosed with attention deficit hyperactivity disorder ("ADHD") and depression and prescribed medication for the ADHD. In addition, G.C. has run away from the family home approximately twelve times. The Mother testified that she has never seen G.C. behave violently or aggressively toward any of his siblings.

On June 12, 2014, G.C. was Baker Acted, and he was returned to the family

4

home on June 14, 2014. At approximately 8:00 p.m. on the evening that G.C. returned to his home after being Baker Acted, R.C., the Mother's adult daughter who was living with the Mother, placed E.C. on the toilet unclothed, and then she yelled out to inform her Mother, who was in the kitchen, that E.C. was in the bathroom. As the Mother was walking to the bathroom to attend to E.C., she told G.C. to pick up a towel from the bathroom floor, and then she stopped to answer the phone. Moments later, the Mother heard E.C. scream, which the Mother described as a noise he makes when he is upset, not when he is in pain, and she immediately went toward the bathroom to attend to E.C. However, before the Mother was able to enter the bathroom, E.C. and G.C. exited the bathroom with G.C. nudging E.C. from behind. The Mother testified that E.C. was "silent" crying, with his mouth open but with no noise coming out, and he was holding the side of his head where he had the brain surgery. Based on E.C.'s actions, the Mother checked E.C.'s head and body. She did not see any burns, marks, or bruises, but she admitted that she had focused mainly on E.C.'s head. The Mother placed a diaper on E.C., who did not appear to be in pain, and then she went into the bathroom where she did not see or smell anything unusual. Meanwhile, G.C. took E.C. to his bedroom and dressed E.C. in pajamas with long sleeves and pants. When the Mother entered the bedroom, she noticed that G.C. had a white cloth in his hand, and when she asked G.C. about the cloth, G.C. told her it only had water

5

on it. That night, E.C. and G.C. slept in the Mother's bed while the Mother slept on a sofa at the edge of the bed. The Mother was awake until 4:00 a.m., and she testified that E.C. did not cry out.

E.C. woke up the next morning at 10:00 a.m. and was cared for primarily by R.C. Around 12:30 p.m., when R.C. removed E.C.'s pajama top and she saw the burns, she notified the Mother, who immediately took E.C. to an urgent care center. The Mother testified that, although she does not know how E.C. was injured, she believes G.C. inflicted the injuries. The Mother testified that she has various household cleaning supplies at home, such as pure bleach, watered-down bleach, Fabuloso, Comet, and Lysol, but G.C. only had access to the watered-down bleach and Fabuloso.

## B. Dr. Jefry Biehler's testimony

Dr. Biehler testified that E.C. was taken by his Mother to an urgent care facility affiliated with Miami Children's Hospital and was later transported to Miami Children's Hospital. Dr. Biehler examined E.C. at Miami Children's Hospital on June 16, 2014, and noted that E.C. had burns that extended from over his shoulder and down his back, with a dripline going from the back of his leg to his ankle. Dr. Biehler described the burns as "significant" "dried partial thickness burns" and opined that they were "certainly potentially scarring injuries, potentially life threatening injuries" because "any burn that . . . is big has potential

6

for being that." However, E.C.'s burns did not require Whirlpool treatment to remove dead skin, surgical debridement, or skin grafts.

Based on the dripline injury, Dr. Biehler opined that E.C. was burned with some form of liquid, which could have been either an "alkaline substance, an acid substance or a hot liquid." Although Dr. Biehler could not definitively state what caused E.C.'s burns or if the burns would have been immediately evident, he explained that while chemical burns and hot water burns can appear quickly, and acid burns generally result in an immediate disruption of the skin, alkaline burns can take more time to become noticeable depending on the PH, the strength of the alkaline solution, and the area where the burn is located. Dr. Biehler further explained:

> But I think a caustic injury [of] that size would have been evident fairly quickly. I don't know if I can say instantly, but I think fairly quickly.
> Again, caustic injuries that are not properly treated, the caustic agent can stay on the skin or in the body part and continue to cause problems for a while. So it's very difficult to say with certainty the timeframe between when he was injured and when I saw him, or the timeframe between the time of whatever it was that touched skin and the skin changes occurred.

Dr. Biehler was also asked whether a chemical that could cause such a burn would have some type of odor. In response, Dr. Biehler stated: "It is possible that it would have some kind of odor. But, again, without knowing what the chemical was, it's hard for me to say that. . . . My experience is things that are caustic have

7

an irritant or a smell to it.  But I can't say with any specificity on this."

Dr. Biehler further testified that he could not "say with any certainty whether [the burns] were accidental or intentional," but that Clorox and common household items do not usually cause severe burns or such a widespread injury.  When Dr. Biehler was asked if E.C. could have sustained those injuries by G.C. wiping him with a cloth as described by the Mother, he stated:

> I think likely because it seems more like possible.  But likely I think again that there are parts of the back that have a wide area that could be from somebody wiping something on there.
> But again the dripline, the line that goes down the leg, does not look like a wipe injury; and it looks like a liquid that has gone down the back.

Dr. Biehler testified that he believes the burns were painful, and when he examined E.C. at the hospital, he noted that E.C. acted uncomfortable and resisted Dr. Biehler.  However, Dr. Biehler stated that with a "severely developmentally delayed child, it was impossible for [him] to tell how much of this [reaction] was pain . . . ."  Moreover, Dr. Biehler testified that during the examination, E.C. would "inappropriately laugh . . . , which is very, very common with children with developmental delays."

Lastly, Dr. Biehler concluded that E.C. was in the care of a caretaker who had no explanation for the burn, and because E.C. is non-verbal and severely developmentally delayed, he is a "very at risk child" who was neglected.

## III.  FINAL JUDGMENT TERMINATING THE MOTHER'S PARENTAL

8

**RIGHTS**

The trial court entered its final judgment terminating the Mother's parental rights as to both G.C. and E.C. pursuant to section 39.806(1)(f). In doing so, the trial court set forth much of the testimony stated above and found that the Mother's testimony was not credible.

The trial court found that what happened to E.C. was "intentional, malicious, and calculating," and that it is not likely that G.C. caused the burns. The trial court found that while some of the injuries on E.C.'s back could have been caused by wiping E.C.'s back with a cloth containing a caustic substance, the drip marks indicated that a caustic or hot liquid was poured on E.C. Although the trial court noted that "many disabled or delayed children do not display pain in a typical fashion," the trial court found it difficult to believe that the burns would not have been discovered sooner.

The trial court concluded that the injuries suffered by E.C. were either inflicted by the Mother or inflicted by someone else while under the Mother's care. Thus, the trial court found that E.C. was egregiously abused at the hands of the Mother or, at the very least, while under her protection and/or supervision.

The trial court found that the Department established by clear and convincing evidence that the Mother either (1) engaged in egregious conduct, or (2) had the opportunity and capability to prevent and knowingly failed to prevent

9

egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the Children, thereby establishing the requisite statutory ground for termination of the Mother's parental rights under section 39.806(1)(f). The trial court additionally found that it was in the Children's manifest best interest to terminate the Mother's parental rights. § 39.810, Fla. Stat. (2015). The Mother's appeal followed.[2]

## IV. ISSUE AND ANALYSIS

The issue we must decide is whether the record contains competent substantial evidence to support the trial court's finding that the Department established by clear and convincing evidence that the Mother (1) engaged in egregious conduct, or (2) had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the Children. See R.P. v. Dep't of Children & Family Servs., 975 So. 2d 435, 436 (Fla. 2d DCA 2007) (holding that a trial court's determination that clear and convincing evidence supports the termination of parental rights will not be overturned unless found to be clearly erroneous or lacking in evidentiary support); T.V. v. Dep't of Children & Family Servs., 905 So. 2d 945, 946 (Fla. 3d DCA 2005) ("The standard of review in a case where the trial court terminates parental rights is whether the judgment is

---

[2] The Mother does not challenge the trial court's finding that termination of her parental rights is in the Children's manifest best interest.

supported by substantial and competent evidence."). We recognize that "a parent who was not present during, or who did not participate in, physical abuse may still have their parental rights terminated if they knowingly failed to protect the child from egregious abuse." T.L. v. Dep't of Children & Family Servs. (*In re* Interest of D.L.H.), 990 So. 2d 1267, 1271 (Fla. 2d DCA 2008) (quoting K.A. v. Dep't of Children & Family Servs. (*In re* K.A.), 880 So. 2d 705, 708 (Fla. 2d DCA 2004)).

## A. The finding that the Mother engaged in egregious conduct

In the instant case, the trial court found that the injuries suffered by E.C. were either caused by the Mother or inflicted while under the Mother's supervision. The trial court's finding that the Mother engaged in egregious conduct (in other words, that she inflicted the injuries) is based, in part, on the trial court's erroneous finding that the Children were under the Mother's supervision except for mere "seconds at a time." This finding is, however, not supported by the record, which clearly reflects that both R.C. and G.C. actively assisted the Mother in caring for E.C., thereby spending significant periods of time alone with E.C. and taking E.C. out of the Mother's sight for much more than "seconds at a time." More importantly, R.C., the Mother's adult daughter, took E.C. to the bathroom on the evening when the burns occurred, cared for E.C. the following morning for a lengthy period of time, and allegedly discovered E.C.'s burns when removing E.C.'s pajama top. Further, on the evening E.C. was burned, G.C.

11

accompanied E.C. into the bathroom and dressed E.C. in his pajamas, without the Mother being present. Therefore, contrary to the trial court's finding, the Children were not constantly under the Mother's supervision "but for seconds at a time"

We conclude that the trial court's finding that the Mother engaged in "egregious conduct" is based on pure speculation. There is no evidence as to how the injury occurred or who or what caused the injury. As to "who," E.C. was burned while three individuals were at home with him—the Mother, G.C., who had just returned to the family home after being Baker Acted for two days, and R.C. The only evidence as to "who" was the Mother's belief that G.C. inflicted the injury because when E.C. cried out, he was alone with G.C. in the bathroom, and when the Mother ran to the bathroom to see why E.C. had cried out, E.C. was being ushered out of the bathroom by G.C. After checking E.C. and finding no evidence that E.C. had been injured, the Mother placed a diaper on E.C. and then went to the bathroom to see what had caused E.C.'s distress but found no cause for alarm. When she next saw E.C., he was with G.C. in the bedroom, having been dressed by G.C. in long-sleeved pajamas with pants, and G.C. was holding a cloth in his hand. Because the Mother had seen no injury to E.C. when she briefly examined him and she had seen G.C. with a cloth in his hand, she opined that G.C. had wiped something on E.C.'s back with the cloth and the substance caused the burn marks on E.C.'s back.

The trial court concluded that the burns on E.C.'s back were not caused by something being wiped on E.C.'s back. Based on this finding, the trial court made the unsupported leap that the Mother either inflicted the injury or knowingly failed to prevent it. While it is true that Dr. Biehler testified that the dripline injury could not have been caused by wiping, he testified that some of the injuries on E.C's back could have been caused by somebody wiping a caustic liquid on E.C.'s back. Dr. Biehler was not asked about, and his testimony did not eliminate, the possibility that the cloth was sufficiently saturated with a liquid and when it was used to wipe E.C.'s back, some of the liquid ran down E.C's back and down his leg. It also does not eliminate the possibility that G.C. or someone else poured a substance on E.C's back, which dripped down his leg, and the perpetrator had tried to wipe away or clean the liquid off of E.C.'s back with the cloth but failed to wipe the liquid that had dripped down E.C.'s leg.

Because no one was able to opine as to who or what injured E.C. or specifically when E.C. was injured, there is no competent substantial evidence to support the trial court's finding that the Mother engaged in egregious conduct. There is no evidence that the Mother inflicted the injury or that she **knowingly** failed to prevent it from occurring. The record also reflects that upon discovery of the injury, she immediately took E.C. to an urgent care center. It is also noteworthy that, although the Mother has fostered numerous children over the

13

years, and has adopted three of these children, including E.C., who requires round-the-clock care, there is no evidence that she has ever physically injured any of the children in her care.

The trial court found that since E.C. screamed when he was in the bathroom, it was "counterintuitive" that E.C.'s injuries were not discovered until the following day. The Mother's testimony that she examined E.C. immediately after he screamed, but did not see any burns on his body is, however, not inconsistent with Dr. Biehler testimony. Specifically, Dr. Biehler explained that "it's very difficult to say with certainty . . . the timeframe between the time of whatever it was that touched skin and the skin changes occurred" because some burns appear immediately, such as acid burns and water burns, while others do not, such as certain alkaline burns. Moreover, the fact that E.C. screamed does not necessarily indicate that he was injured in the bathroom or even that there were any observable indications that he was in pain. As Dr. Biehler's testimony reflects, and the trial court found, "many disabled or delayed children do not display pain in a typical fashion."

Therefore, based on the record before this Court, the trial court's finding that the Department established by clear and convincing evidence that the Mother engaged in egregious conduct is not supported by competent substantial evidence.

### B. **The finding that the Mother had the opportunity and capability to prevent and failed to prevent the egregious conduct**

14

In the alternative, the trial court found that the Mother had the opportunity and capability but knowingly failed to prevent the egregious conduct. The trial court found that the injuries suffered by E.C. occurred while he was "under the Mother's watch" and "at the very least," E.C. was egregiously abused while "under [the Mother's] protection and/or supervision." Thus, the trial court essentially concluded that, even if the Mother did not participate in the egregious conduct, the Mother's parental rights should be terminated under section 39.806(1)(f) **solely** because she was at home with E.C. when the egregious conduct occurred. We disagree.

When a parent does not engage in the egregious conduct, section 39.806(1)(f) allows for the termination of parental rights if the Department establishes by clear and convincing evidence that the parent "**had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct** . . . ." (emphasis added). The record before this Court is devoid of any evidence that the Mother had the opportunity and capability to prevent the egregious conduct, and there was absolutely no evidence presented to even suggest that she knowingly failed to prevent the egregious conduct. Thus, the Department failed to meet its burden of proof. To hold otherwise would allow the trial court to immediately terminate parental rights without the Department first offering the parent(s) services and without making any attempt whatsoever to keep families intact even

15

though the parent(s) did not participate in the egregious conduct and did not have the opportunity or capability of preventing the egregious conduct.

Accordingly, we reverse the trial court's order terminating the Mother's parental rights as there is no competent substantial evidence to support the trial court's finding that the Department established by clear and convincing evidence grounds for terminating the Mother's parental rights under section 39.806(1)(f), and we remand for further proceedings pursuant to section 39.811, Florida Statutes (2015). Section 39.811(1) sets forth the procedure a trial court shall follow when the grounds for termination of parental rights have not been established by clear and convincing evidence, and provides as follows:

> (1) If the court finds that the grounds for termination of parental rights have not been established by clear and convincing evidence, the court shall:
> (a) If grounds for dependency have been established, adjudicate or readjudicate the child dependent and:
> 1. Enter an order placing or continuing the child in out-of-home care under a case plan; or
> 2. Enter an order returning the child to the parent or parents. The court shall retain jurisdiction over a child returned to the parent or parents for a period of 6 months, but, at that time, based on a report of the social service agency and any other relevant factors, the court shall make a determination as to whether its jurisdiction shall continue or be terminated.
> (b) If grounds for dependency have not been established, dismiss the petition.

Reversed and remanded.

16