NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

In the Interest of C.E., a child. )
                                      )
                                      )
K.E., )
           Appellant, )
                                      )
v. )       Case No. 2D18-1501
                                      )
DEPARTMENT OF CHILDREN )
AND FAMILIES and GUARDIAN )
AD LITEM PROGRAM, )
                                      )
           Appellees. )
                                      )

Opinion filed January 4, 2019.

Appeal from the Circuit Court for
Hillsborough County; Emily A. Peacock,
Judge.

Scott L. Robbins of Scott L. Robbins,
Attorney at Law, Tampa, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Mary A. Soorus,
Assistant Attorney General, Tampa, for
Appellee Department of Children and
Families.

J. Logan Murphy of Hill, Ward,
Henderson, Tampa and Thomasina
Moore and Laura Lee, Statewide
Guardian Ad Litem Office, Tallahassee,
for Appellee Guardian Ad Litem Program.

PER CURIAM.

K.E. (the Mother) appeals from the trial court's final judgment terminating her parental rights to her child, C.E. (the Child), under sections 39.806(1)(c) and 39.806(1)(f), Florida Statutes (2017).  Because the evidence before the trial court was insufficient to support termination of the Mother's parental rights, we reverse.[1]

The Child came into child protective services of the Department of Children and Families (the Department) when he was five weeks old.  The Mother brought the Child to the emergency room on Saturday, July 15, 2017, after noticing limited movement of the Child's left arm.  Further examination of the Child revealed that he had a nondisplaced, oblique fracture of his left humerus bone, the upper arm bone.

On July 17, 2017, the Department filed an emergency shelter petition, alleging that the five-week-old Child had a fractured arm and that the Mother was unable to provide an appropriate explanation for the cause of the Child's injury.  Upon his release from the hospital, the Child was placed in the temporary custody of the Department.  On August 17, 2017, the Department filed an expedited petition to terminate the Mother's parental rights.  An amended expedited petition was filed on December 22, 2017, alleging that the Mother engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatened the life, safety, or physical, mental, or emotional health of the Child under section 39.806(1)(f) and that the Mother's continued involvement with the Child

[1]The Father was never involved with the Child and voluntarily executed written surrenders for the Child.  The Father's parental rights were also terminated.  He has not appealed from the final judgment.

threatened the Child's life, safety, well-being, or health, irrespective of the provision of services under section 39.806(1)(c). Because the Department sought termination under subsections 39.806(1)(c) and (f), the Department did not, and was not required to, make "[r]easonable efforts to preserve and reunify" the family. See § 39.806(2), Fla. Stat. (2017).

The Mother testified that on the night of July 14, 2017, she and the Child were sleeping in the bedroom that the Mother shared with her boyfriend. At some point, the Child started crying, and the Mother took the baby into the living room to nurse. Around 9:00 a.m., the boyfriend woke the Mother up on the couch; she had fallen asleep in a semi-upright position with the baby between her and the back of the couch. The Mother did not think that the Child had been injured, and the Child was not displaying any signs of pain.

The Mother nursed the Child before traveling with the Child to the maternal grandmother's house, arriving around 10:00 a.m. The grandmother fed the baby and put him in a swing. The Child was acting normally and was not displaying any signs of pain or distress. The Mother, the Child, and the grandmother later went to a friend's house to use the pool where the Child remained in his car seat and slept under a covered lanai. The Mother and the Child went back to their house around 3:00 p.m.

The Child was still sleeping in his car seat when they arrived home. When the baby woke up, the Mother fed him and changed his diaper. At that point, the Mother noticed that the Child was not raising his left hand up with his right hand as he usually did when she changed his diaper. Instead, the Child was keeping his left arm straight down by his side. The Mother testified that she did not have reason to believe that

- 3 -

something had happened to the Child's arm. The Child was behaving normally and was not acting like he was in pain: he was not crying inconsolably, and the Mother did not notice any redness, abrasions, swelling, or bruising on his arm.

Initially, the Mother called the pediatrician's office for advice, but the office was closed. She then searched the internet for possible reasons why an infant would be favoring one arm. According to her internet search, she determined that the Child may be suffering from "nursemaid's elbow," which is a partial dislocation of the elbow and is common in children ages one to five years old. The Mother's online research revealed that the symptoms associated with nursemaid's elbow include favoring one arm over the other and that nursemaid's elbow is easily remedied by performing a nursemaid's elbow reduction. The Mother attempted to perform the nursemaid's elbow reduction procedure herself on the Child at approximately 4:00 p.m.

The Mother demonstrated the procedure she performed on the Child at the adjudicatory hearing. She held the Child's arm just above the elbow with her thumb on the Child's bicep and her fingers around his triceps; she put her other hand around the Child's wrist and turned the Child's wrist from left to right and back again at a 180-degree angle. The Mother heard a faint "pop," but she did not know whether the noise came from the Child or from her own wrist.

At first, the Mother thought that the maneuver had worked. While the Child did not immediately start moving his arm, she had read online that it could take several hours after the procedure for the Child to start moving his arm normally. The Mother testified that after she performed the procedure, the Child did not appear to be in pain and was not crying. Thereafter, she took the Child to Walmart.

After returning from Walmart, the Mother noticed that the Child was still not moving his arm normally. At that point, she took the Child to the hospital between 7:30 p.m. to 8:00 p.m. The Mother testified that she waited to take the Child to the hospital because she thought that she had fixed his arm. At the hospital, X-rays were performed, and it was determined that the Child had a nondisplaced oblique fracture of his left humerus.

The Mother testified that she does not know how the Child's arm was fractured. She admitted that she did not tell anyone at the hospital about performing the nursemaid's elbow reduction because she did not, and does not, believe that she caused the fracture by performing the nursemaid's elbow reduction; however, she admitted that she could not say for sure whether the maneuver caused the fracture.

The Mother testified that when the Child was five days old, she fell asleep while she was sitting on her bed breastfeeding the Child. The Child fell approximately two feet onto the carpeted floor. The Mother immediately took the Child to the pediatrician, who performed an exam on the Child and reassured the Mother that the Child was fine. No X-rays were taken at that time, and the Mother was counseled as to the dangers of co-sleeping. The Mother testified at the adjudicatory hearing that she thought the Child may have sustained the arm fracture as a result of this fall.

The grandmother testified to a timeline substantially similar to the timeline the Mother provided for July 15, 2017. However, the grandmother testified that after leaving the pool, she next heard from the Mother between 3:00 p.m. and 4:00 p.m. when the Mother texted her that the Child was holding his arm funny and that she was

concerned. About thirty minutes later, the Mother texted the grandmother again, saying that she thought she had fixed the Child's arm.

The deposition testimony of Dr. de Brigard, the Child's pediatrician, was read into the record at the adjudicatory hearing. Dr. de Brigard first saw the Child for a newborn exam on June 12, 2017, when he was four days old. There were no concerns regarding the Child after the newborn exam. He saw the Child again two days later on June 14, 2017, after the Child fell off the bed. After examining the Child, he determined that the Child was not injured; there was no bruising or any other signs of injury. Dr. de Brigard advised the Mother that she should not breastfeed on the bed and suggested getting help to feed the baby because if she falls asleep, she may suffocate the Child. The doctor discussed newborn safety issues with the Mother, which included smoking and breastfeeding. Dr. de Brigard saw the Child for a third time on July 12, 2017, three days before the incident, for his one-month exam. The doctor saw no injuries on the baby and had no concerns regarding the Child.

Sandra Shulman is a registered nurse practitioner with the child protection team. After the Child was referred to the child protection team on July 16, 2017, she performed a medical records review and a physical examination of the Child. Ms. Shulman testified that the Child had a nondisplaced, oblique fracture of his humerus. Ms. Shulman explained that an oblique fracture is a fracture that is at an angle and torsion to the arm, or a twisting motion, is required to cause this type of fracture, which is different than a fracture that is caused by a direct blow.

Ms. Shulman testified that she was familiar with nursemaid's elbow and the nursemaid's elbow reduction. She demonstrated how a nursemaid's elbow

reduction procedure is performed. Her demonstration was substantially similar to the Mother's earlier demonstration. Ms. Shulman testified that one might hear a pop when the bone goes back into joint. Ms. Shulman testified that the reduction should be done by a trained medical professional because an untrained person could cause or worsen an injury due to the twisting motion involved. However, she acknowledged that if a layperson is taught how to do the reduction by a medical professional, or if it happens repeatedly, which it sometimes will, a layperson could perform the reduction.

Ms. Shulman testified that during her examination of the Child, the only outward manifestation the Child was showing was that he was favoring his left arm, which is consistent with symptoms of nursemaid's elbow. She testified that there was no swelling, bruising, or redness on the Child. The Child was not "overwhelmingly crying" during her exam. Ms. Shulman acknowledged that if she did not have the X-ray of the Child's arm, she would not know that he had a fractured arm just by looking at the Child. Ms. Shulman acknowledged that it was possible that pulling, yanking, or grabbing the Child by the arm or hand could cause nursemaid's elbow.

Ms. Shulman testified that at the conclusion of her examination the only thing she was able to determine with a reasonable degree of medical certainty was that the five-week-old Child had a fracture, oblique in nature, of the left humerus. Ms. Shulman's impression of this case was that the Child was inflicted with a nonaccidental injury based on what was known at the time. Ms. Shulman explained that an "inflicted" injury means that something caused the injury. It did not mean that someone intended to cause the injury.

Ms. Shulman testified that she did not know the cause of the fracture but concluded that something must have happened to the Child to cause the injury because a one-month-old baby does not roll over and does not spontaneously get fractures. Ms. Shulman testified that any number of the Mother's actions could have caused this injury. Ms. Shulman acknowledged that if the Mother had, in fact, performed the reduction, it was possible that the reduction could have caused the injury. It was also possible that the Mother co-sleeping with the Child could have caused the injury. It was also possible that something else happened to the Child. Ms. Shulman could not say with any degree of medical certainty whether the Child's injury was accidental or intentionally inflicted or whether the Mother caused the injury. Ms. Shulman acknowledged that she did not know whether any other people had been around the Child during the time the injury could have occurred or whether someone else could have caused the injury to the Child. She also acknowledged that there were no other injuries to the Child—no other broken bones, no healing fractures, no bruises on the head, and no signs of shaken baby syndrome.

Maria Torres was assigned as the Child's guardian. Ms. Torres testified that she visited the Child twice a month and that she observed the Mother visiting the Child twice. Ms. Torres testified that the Mother's interaction with the Child was good; the Mother is loving and nurturing toward the Child, handles the Child appropriately, and loves the Child. Ms. Torres testified that the Mother visits the Child four times per week for two hours per visit, which is the maximum amount of the time the Mother is allowed to visit the Child per court order. Despite this testimony, Ms. Torres opined that the Mother would not be able to provide a safe and stable home if the Child were returned

- 8 -

to her because he was sheltered because of the unexplained fractured arm, because the Mother co-slept with the Child after being advised against co-sleeping, and because the Mother continued to smoke and breastfeed after being told to stop smoking.

Tangila Roberson is the case manager assigned to the Child. She observed the visits between the Mother and the Child and testified that the Mother visits the Child four times a week and has not missed a visit. Ms. Roberson testified that the Mother is good with the Child, loves the Child, is nurturing toward the Child, and handles the Child appropriately. There is a bond between the Mother and the Child. Ms. Roberson has never seen the Mother become angry with the Child. Ms. Roberson testified that after she spoke with the Mother about smoking, the Mother indicated that she would quit smoking. Since that time, Ms. Roberson has not seen the Mother smoking.

The Mother presented three witnesses at the adjudicatory hearing. Carmen Mays testified that she is a therapist at Northside Behavioral Health Center and that she facilitates a group for parents of children ages one to four, which is a court-approved parenting class used in child-dependency cases. Ms. Mays testified that the Mother enrolled in her parenting class and obtained a certification of completion after attending six group therapy classes and completing all homework assignments. Ms. Mays testified that she believed that the Mother understood the concepts taught in the class.

Eric Brotherton, a licensed mental health therapist at Northside Behavioral Health Center, testified that he had three individual therapy sessions with the Mother. The Mother's sessions focused on situational stress and anxiety related to the removal

of her Child. Mr. Brotherton testified that the Mother acted appropriately during their sessions and that she was able to communicate well. Mr. Brotherton testified that the Mother would be amenable to continuing with therapy. Mr. Brotherton testified that he did not see any inconsistencies in the Mother's presentation, he did not perceive any issues with self-harm or harm to other people, and he did not perceive any anger issues, any cognitive disabilities, or any mental health issues other than the adjustment disorder, which was a result of her anxiety related to the removal of her Child.

Finally, Dr. Hamid Latif testified as the Mother's final witness. Dr. Latif was the pediatrician who admitted the Child at the hospital. Dr. Latif testified that the Child suffered a nondisplaced fracture, which he referred to as a "hairline fracture." Dr. Latif explained that when he sees something like a bone fracture in a very young child, he orders a CT scan of the brain, an eye exam, and a skeletal survey to make sure there is no concurrent or hidden injury and to make sure everything is intact. An eye exam is performed to make sure there are no retinal hemorrhages or anything that may indicate that the child has shaken baby syndrome. Dr. Latif testified that the Child's CT scan was normal, the eye exam was normal, and the skeletal survey showed no other fractures and no healing fractures.

Dr. Latif testified that he was familiar with nursemaid's elbow and with the procedure to remedy nursemaid's elbow. He explained that you "just kind of shake hands with the person, hold onto the elbow and twist it one way, and the other way" and it "just pops back in." Dr. Latif explained that the nursemaid's elbow is usually seen in toddlers and children that are walking; if you lift them up by the arm, the bones come out of the socket, which can cause swelling and pain. He acknowledged that it would

- 10 -

be unusual for a five-week-old child to have nursemaid's elbow but noted that it would not require a lot of force to cause nursemaid's elbow in an infant and stated that lifting a five-week-old child by the wrist could cause nursemaid's elbow. According to Dr. Latif, it could take an hour or two for the child to start using his arm again after the reduction because it takes time for the swelling to go down. Dr. Latif testified that it would not be abnormal to wait an hour or two to see if the procedure worked.

Dr. Latif testified that he did not notice any signs of trauma, bruising, or swelling on the Child. The Child was not crying when Dr. Latif examined him. Without the X-ray, Dr. Latif would not have known that the Child's arm was fractured, as the Child was not exhibiting any obvious signs of pain during the examination. Dr. Latif testified that it would be possible that if a person did not know that there was a fracture, any expression of pain or discomfort could be misinterpreted as fussiness or colic. Dr. Latif testified that he could not tell what caused the fracture just by looking at the X-ray. He testified that the fracture could have been caused by a fall or by someone mishandling the baby.

### The Final Judgment Terminating the Mother's Parental Rights

The trial court entered its final judgment terminating the Mother's parental rights to the Child pursuant to sections 39.806(1)(c) and (f). The trial court found that there was clear and convincing evidence to terminate the Mother's parental rights pursuant to section 3.806(1)(f), finding that the Child was a victim of an egregious act that occurred on Saturday, July 15, 2017, and that the Mother "either inflicted the injury or knows who did, and is covering for that person."

The trial court also found that there was clear and convincing evidence to support the termination of the Mother's parental rights under section 39.806(1)(c), finding that the Mother's continued involvement with the Child threatens the life, safety, well-being, or physical, mental, or emotional health of the Child, irrespective of the provision of services. The trial court noted that the Mother engaged in some services on her own, including attending parenting classes and individual therapy, but found that the provision of services to this Mother would be futile because the Mother lacked credibility with the trial court, was not honest about what happened to the Child, and demonstrated an inability to follow the most basic safety instructions.

The trial court additionally found that it was in the Child's manifest best interest to terminate the Mother's parental rights and that because the Mother subjected the Child to an egregious act and behaved recklessly and dangerously, without regard for the Child's safety and well-being, termination of her parental rights was the least restrictive means to protect the Child from harm.

After a thorough examination of the record, we find that it does not contain the clear and convincing evidence necessary to terminate the Mother's parental rights. See R.P. v. Dep't of Children & Family Servs., 975 So. 2d 435, 436 (Fla. 2d DCA 2007) (holding that a trial court's determination that clear and convincing evidence supports the termination of parental rights will not be overturned unless found to be clearly erroneous or lacking in evidentiary support); T.V. v. Dep't of Children & Family Servs., 905 So. 2d 945, 946 (Fla. 3d DCA 2005) (holding that the standard of review where a trial court terminates parental rights is whether the order is supported by competent, substantial evidence). In order to grant a petition for termination of parental rights, a

- 12 -

trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the manifest best interests of the child. See § 39.802(4)(a), (c); Padgett v. Dep't of Health & Rehab. Servs., 577 So. 2d 565, 571 (Fla. 1991) (holding that before a parent's rights can be terminated, the Department must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child). Further, because parental rights constitute a fundamental liberty interest, the Department must establish that termination of parental rights is the least restrictive means of protecting the child from serious harm. Id. at 571.

### Termination under Section 39.806(1)(f)

Section 39.806(1)(f) provides for the termination of parental rights when a parent has "engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child." § 39.806(1)(f). Egregious conduct is defined as "abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct." § 39.806(1)(f)(2). "Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child." Id.

The trial court found that the Mother engaged in egregious conduct that threatened the life, safety, or physical, mental or emotional health of the Child, reasoning that "[t]here has been no logical explanation for the [C]hild's injury offered, and five-week-old children are not capable of injuring themselves without the knowledge of an adult, thus someone inflicted the injury." The trial court found the Mother's

- 13 -

testimony regarding the Child having nursemaid's elbow to be "preposterous" and relied upon the testimony from Ms. Shulman and Dr. Latif to support the finding that there are no normal, nonabusive circumstances by which a five-week-old could sustain nursemaid's elbow. The trial court found it incredible that the Mother would believe that the Child had nursemaid's elbow and further found that even if the Mother had attempted to correct the issue, which the trial court expressly rejected, the Mother's actions would have been reckless and negligent. The trial court found that the Child was injured sometime during the day on Saturday, July 15, 2017, at a time when the Child was in the exclusive care of the Mother. Therefore, the court found, "without hesitation," that the Child was the victim of an egregious act and that the Mother either inflicted the injury or "knows who did and is covering for that person."

Other than the Mother's explanation of having performed the nursemaid's elbow reduction, which the trial court rejected as preposterous and incredible, there was no evidence as to how the Child's injury occurred or who or what caused the injury. From this dearth of knowledge, the trial court speculated that, whatever it was, it must have been egregious.

Ms. Shulman testified that she could not say to a medical certainty whether the Child's injury was accidental or intentionally inflicted; she could not say whether the Mother caused the injury or whether the injury was caused by someone else who had access to the Child. Ms. Shulman acknowledged that the fracture could have been caused by the Mother's attempt at the nursemaid's elbow reduction or when the Mother fell asleep with the Child on the couch. Dr. Latif testified that the injury could have been caused by a fall or by someone mishandling the Child.

- 14 -

This uncertainty as to the Mother's role in the Child's injury is reflected in the trial court's oral findings, wherein the judge stated:

> I think she [the Mother] does know [how the Child's arm got fractured] and because she's not telling us what happened, I think it's worse - - the worst case scenario and the scenario that makes me really fear for the infant, because this was a defenseless little newborn, five weeks old, who probably was fussy because he may have needed more to eat than he was eating, or whatever, and I think somebody got angry. I don't know who did, but somebody did and that's the only thing that has a reasonable explanation.

There was absolutely no evidence presented that the Child was underfed or that anyone displayed any anger toward the Child. In fact, Ms. Roberson, the case manager, testified that she never saw the Mother become angry with the Child; the maternal grandmother testified that the Mother was not an angry person; and Mr. Brotherton, the Mother's therapist, testified that the Mother did not have any anger issues. The trial court's finding that the Mother "either inflicted the injury, or knows who did and is covering for that person" is not based on competent, substantial record evidence, but rather on the trial court's speculation—which cannot constitute clear and convincing evidence and cannot serve as a valid basis for terminating the Mother's parental rights. See M.C. v. Dep't of Children & Families, 186 So. 3d 74, 80 (Fla. 3d DCA 2016); K.R.L. v. Dep't of Children & Family Servs., 83 So. 3d 936, 939 (Fla. 3d DCA 2012) (citing R.W.W. v. Dep't of Children & Families, 788 So. 2d 1020, 1023 (Fla. 2d DCA 2001)).

Moreover, the trial court's finding that the Child was in the Mother's exclusive care during the afternoon of July 15, 2017, is not supported by the record. The record clearly reflects that both the maternal grandmother and the Mother's

- 15 -

boyfriend had access to the Child on July 15, 2017. Because no one was able to opine as to who or what injured the Child, there was no competent, substantial evidence to support the trial court's finding that the Mother engaged in egregious conduct. See M.C., 186 So. 3d at 80.

In M.C., the mother took her child to the hospital with second-degree burns over the back side of his body. Id. at 76. The mother stated that she believed that her older child had inflicted the burns; however, she was not able to provide a "cohesive explanation" as to how the burns occurred. Id. The trial court found that the mother's testimony was not credible and that what happened to the child was intentional, malicious, and calculating, concluding that the injuries suffered by the child were either inflicted by the mother or inflicted by someone else while under the mother's care. Id. The Third District reversed the trial court's finding of egregious conduct, reasoning that it was based upon pure speculation, as there was no evidence as to how the injury occurred or who or what caused it. Id. at 80. Likewise here, the dearth of evidence regarding the cause of the Child's injury undermines the trial court's speculative conclusion that it was the result of egregious conduct.

Additionally, the trial court identified, and the Department presented evidence of, only one instance of purportedly egregious conduct. And the record in this case reveals that this was a one-time occurrence; there was no evidence of any prior injuries or continued abuse. Both Dr. Latif and Ms. Shulman testified that they did not see any bruises or adhesions on the Child and that the Child did not have any other broken or fractured bones. His hospital scans showed no sign of healing fractures, and there were no signs of shaken baby syndrome. Dr. de Brigard testified that he saw the

- 16 -

Child on three separate occasions and never noticed any bruising or adhesions on the Child. For a single occurrence to constitute "egregious conduct," it must have been of such intensity, magnitude, or severity as to endanger the life of the child. § 39.806(1)(f)2. While the Child suffered from a fractured arm, there was no evidence of any prior abuse, and while the Mother's actions in performing the nursemaid's elbow reduction may not have been the most prudent course of action, it does not rise to the level of deplorable, flagrant, or outrageous. And there was certainly no evidence that her actions threatened the life of the Child.

Therefore, based on the record before this court, the trial court's finding that the Department established by clear and convincing evidence that the Mother engaged in egregious conduct is not supported by competent, substantial evidence.

### Termination under Section 39.806(1)(c)

In order to terminate parental rights under section 39.806(1)(c), the trial court must find that the child's life, safety, or health would be threatened by continued interaction with the parent regardless of any services provided to the parent. § 39.806(1)(c). "In essence, the trial court must find that any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent." R.W.W., 788 So. 2d at 1023.

In this case, the trial court found that any provision of services to the Mother would be futile. First, the trial court found that the Mother lacked credibility and that she was not honest about what happened to the Child to cause the fractured arm, surmising that the Mother "must certainly know what happened to her [C]hild, whether she inflicted the injury or someone else did." The trial court noted that the Mother had

- 17 -

been counseled regarding the risk of co-sleeping with the Child and, despite these warnings and an acknowledgment from the Mother that she knew co-sleeping was unsafe, the Mother chose to continue to endanger the Child by co-sleeping with him.[2] Therefore, the trial court found that the Mother could not be honest and had "demonstrated an inability to follow the most basic of safety instructions and the provision of services would be futile."

The trial court's finding that the provision of services to the Mother would be futile is not supported by competent, substantial evidence. The Department presented no evidence that the Mother is not amenable to services. In fact, the only evidence presented was that the Mother has quit smoking and voluntarily completed a parenting class and individual therapy sessions, despite not being offered any services from the Department. Contrary to the trial court's findings, the evidence supports the Mother's contention that she is amenable to treatment and that the provision of services would not be futile. The Mother is healthy, has a job, has adequate housing, provided pre- and post-natal medical care to her Child, and provided clothing, food, and love for her Child while he was in her care. The trial court erred in terminating the Mother's parental rights "based on its own speculation and the Department's unproven assertions." See R.W.W., 788 So. 2d at 1024 (citing F.C. v. Dep't of Children & Families, 780 So. 2d 159, 162 (Fla. 2d DCA 2001) (holding that while the father appeared to lack the ability to properly care for his children, it was error to terminate his parental rights without giving him the opportunity to try)).

---

[2]Whether the second incident—involving the mother falling asleep on the couch while nursing the Child—constitutes "co-sleeping" is not crucial to this court's opinion.

**Manifest Interest and Least Restrictive Means**

The Department is required to prove all of the elements listed in section 39.810 in order for the trial court to determine whether terminating the parent's rights is in the manifest best interests of the child. I.R. v. Dep't of Children & Family Servs., 904 So. 2d 583, 588 (Fla. 3d DCA 2005). In this case, the Department failed to prove that terminating the Mother's parental rights was in the manifest best interest of the Child. The evidence did not support a finding that the Mother engaged in egregious, or even abusive, behavior, and the Department failed to make reasonable efforts to reunify the Mother with the Child and failed to offer the Mother appropriate services that would allow for a safe reunification.

The Department also failed to show by clear and convincing evidence that terminating the Mother's parental rights was the least restrictive means of protecting the Child from serious harm. Ordinarily, to prove that termination of parental rights is the least restrictive means of protecting the child, the Department must show that it has made a good-faith effort to rehabilitate the parent and reunite the family, such as through the provision of a case plan. In re T.M., 641 So. 2d 410, 413 (Fla. 1994) (citing Padgett v. Dep't of Health & Rehab. Servs., 577 So. 2d 565, 571 (Fla. 1991)). However, in cases involving egregious conduct by a parent, "the termination of parental rights without the use of plans or agreements is the least restrictive means." Id.

Here, the Department failed to prove that the Mother was involved in egregious conduct or that the Child's life, safety, or health would be threatened by continued interaction with the Mother, and the evidence failed to support a finding that termination was the least restrictive means to protect the Child. The Department did not

offer any evidence that the Child would be harmed by continued custody with the foster parent while the Mother worked on a case plan (or even that leaving the Child in the custody of the Mother would lead to abuse, abandonment, or neglect), nor did the Department prove that termination was the only option to protect the Child. The Mother was never given the opportunity to establish that she could safely maintain a relationship with her Child. The record reveals that the Mother voluntarily enrolled in parenting classes and attended therapy sessions. The Mother has visited the Child at every possible opportunity, and the testimony revealed that the Mother is nothing but appropriate and loving toward the Child. There was absolutely no evidence presented that would support the trial court's finding that termination of the Mother's parental rights was the least restrictive means to protect the Child from serious harm. See K.M.B. v. Dep't of Children & Families, 793 So. 2d 39, 40 (Fla. 2d DCA 2001) (citing J.L.C. v. Dep't of Children & Family Servs., 750 So. 2d 38 (Fla. 2d DCA 1995)).

Accordingly, we reverse the trial court's order terminating the Mother's parental rights, and we remand for further proceedings pursuant to section 39.811.


KELLY, MORRIS, and ATKINSON, JJ., Concur.