994 So.2d 496 (2008)
J.J., Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 4D08-1825.
District Court of Appeal of Florida, Fourth District.
November 12, 2008.
*497 Roger Ally of the Law Offices of Roger Ally, P.A., Fort Lauderdale, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Jeffrey P. Bassett, Assistant Attorney General, Fort Lauderdale, for appellee.
TAYLOR, J.
The mother, J.J., appeals a final judgment terminating her parental rights to twin infants, who were born five years after her parental rights to a sibling child were terminated for egregious conduct. The mother argues that the trial court erred in terminating her parental rights to the twins without substantial competent evidence sufficient to constitute clear and convincing evidence that she poses a substantial risk of significant harm to the twins, that termination of parental rights is the least restrictive means of protecting the twins from harm, and that termination is in the manifest best interest of the twins. For reasons discussed below, we reverse the order terminating parental rights and remand for further proceedings.
In July 2002, the mother and her boyfriend, A.H., brought their three-month old daughter, A2.H., to the hospital emergency room for an arm injury.[1] An examination revealed twenty-nine fractures of the child's arm, ribs, and skull that were in various stages of healing. At the time, the mother and father were residing together with A2.H. and the mother's two and a half year old son, A.J.C.[2]. The children were placed in shelter with the mother's aunt and uncle and adjudicated dependent. After an adjudicatory hearing on November 25, 2002, the mother and father's parental rights to A2.H were terminated. The mother's parental rights to the sibling, *498 A.J.C., were also terminated.[3] A2.H. was adopted by her maternal aunt and uncle, and A.J.C. was adopted by his maternal grandmother.
Five years later, on February 15, 2007, the mother, J.J., gave birth to twins fathered by A.H. Two days after the children were born the Department of Children & Families (DCF) filed a petition seeking shelter care for the newborn twins. The petition alleged that there was probable cause of a substantial risk of immediate harm to the children, based on the parents' history with DCF, their placement on probation for aggravated child abuse and child neglect, and termination of their parental rights to two of the twins' siblings for egregious conduct. The petition also alleged that the mother was homeless and unemployed and that the father, A.H., was living in a halfway house. The trial court granted the shelter petition and placed the children with their maternal aunt and uncle.
DCF did not offer the parents a reunification case plan. Instead, on March 23, 1997, DCF filed a Petition for Termination of Parental Rights ("TPR") to the twins under Florida Statute sections 39.806(1)(f) and (i), alleging the parents' egregious conduct toward the children's older sibling, A2.H, and the involuntary termination of the parents' rights to A2.H. and A.J.C. The father executed a voluntary surrender of his parental rights at an advisory hearing on July 26, 2007.
The trial court held an adjudicatory hearing on the petition to terminate the mother's parental rights on October 18, 2007. Before the hearing, the parties stipulated that the mother's parental rights to the children's siblings, A2.H. and A.J.C., were involuntarily terminated on March 17, 2003, that the mother was placed on probation for five years after pleading no contest to aggravated child abuse, and that the mother had completed probation on June 14, 2007.
The mother was the first witness called by DCF at the TPR hearing. The mother testified that soon after her twin babies were taken from her, she enrolled in a counseling program at Women In Distress. There, for over six months, she received weekly individual and group counseling and attended parenting classes that addressed issues of parenting, child abuse, discipline, protection of children, and domestic violence. When questioned about what she learned from counseling and parenting classes, the mother responded that she learned how to protect her children from harm by not leaving them with strangers, by fully investigating day care facilities and conducting background checks on caregivers, and by not allowing anyone but family members to watch her kids. She said she also learned about the effects of domestic violence on children and how to leave a harmful situation and seek a stable and safe place for the children.
The mother testified that she wants to be reunified with her children and that she is able to provide a safe and nurturing environment for them. She is twenty-six years old, employed, and has a home in a family environment in a safe neighborhood. The mother explained that she is living in the home of her friend's mother, Laura Flanagan, whom she has known for over twelve years. According to the mother, Ms. Flanagan regards her like a daughter and has offered to help her get on her feet and take care of her children. The *499 mother pays her $300 a month for rent and utilities. The mother testified that she has held steady employment as a hostess at a hotel, earning between $1200 and $1400 per month. She travels every week to Orlando to visit the children and has contributed about $2000 to $3000 worth of supplies for their care.
Counsel for the Guardian Ad Litem questioned the mother about the multiple bone fractures sustained by A2.H., her infant daughter to whom her rights were terminated in 2002. The mother denied that either she or the child's father, A.H., inflicted the injuries. She believed that a person named Wilfredo Sanchez (a/k/a Junior), who lived with them for two months and sometimes babysat for the child, may have been responsible for the injuries. She testified that although she did not cause the injuries, she has taken responsibility for the abuse and addressed her responsibility through counseling. Although she did not believe that the child's father, A.H., caused the injuries, she did not believe he would be a good parent to the twins, given his incarceration for drugs. She said she planned to continue without him and that he would no longer be a part of her life.
Eliot Yaro, a child protection investigator with the Broward Sheriff's Office, testified about his involvement, which was limited to obtaining a shelter order for the children. He received an abuse hotline call that the mother had just given birth to two children in the hospital and had no place to live after her discharge from the hospital. After his background investigation revealed that the mother had a prior criminal record for child abuse, he decided to file a petition to have the children placed in shelter care.
Fiona Jaiman, a termination of parental rights supervisor for ChildNet, testified that her staff decided to move this case directly from a shelter placement to a termination of parental rights case without offering the mother a reunification case plan. Their decision was based on the history of the egregious abuse against the sibling child, A2.H., and the general view that children, as babies, are better candidates for adoption.
Jaiman stated her opinion that the mother lacks the ability or disposition to provide the children with food, clothing or shelter and recommended that the court terminate the mother's parental rights and free the children for adoption. On cross-examination, Jaiman admitted that she had never talked to the mother nor independently investigated the mother's ability to provide for her children. She felt that the mother's documentation of a "few paychecks" was insufficient to prove that she has the ability to provide for them. Jaiman also testified that she did not believe that the mother has the capacity to ensure the health, safety, and well-being of the children because she appears to minimize what happened to A2.H. and still believes that the father would be a good father to A2.H. as well as the twins.
Linda DeHoet, the assigned active guardian for the children, testified that she has never had any conversations with the mother about this case nor visited with the children in their placement in Ocoee, Florida. A courtesy guardian ad litem from Orange County was assigned to visit the children there on a monthly basis. DeHoet testified that the courtesy guardian reported that the twins were thriving and that all of their needs were being met by the maternal uncle and his wife, who wanted to adopt them. DeHoet said that she did not think that the mother has the ability and disposition to provide the children with food, clothing, and other necessities because her income and housing are inadequate and "based on the reason why *500 the case came into care and the petition was filed." She testified that the courtesy guardian ad litem reported that the children had formed a bond and attachment with their custodians and recommended that the mother's parental rights be terminated so the children could be adopted.
At a continuation of termination proceedings conducted in January 2008, Laura Flanagan testified on behalf of the mother. She said she has known the mother since she was a young girl. The mother has been residing with her in her home and contributing to household and car expenses. Flanagan testified that she has accompanied the mother on her weekly trips to Orlando to visit with her children. She described how the face of one of the twins lit up when the mother arrived and said that she had never experienced anything like the instant bond she witnessed between the mother and the twins. Flanagan said she is willing to allow the mother to continue living with her and to provide a support system for her and the children.
Carmen Ramirez also testified for the mother. Ramirez is a group counseling facilitator at Women In Distress and a former case worker for ChildNet. She testified that the mother entered their program of her own volition and signed up for the parenting class and self-esteem group. Ramirez said that the mother regularly attended sessions and actively participated in seventeen or eighteen self-esteem group sessions, as well as at least thirty parenting classes. The mother never mentioned any involvement in abusive relationships with men and advised only that she was seeking help because her twin children were removed from her care at birth. When the mother was called again to testify during her part of the case, she said that she was continuing to take classes and participate in programs at Women In Distress and testified in detail concerning the parenting skills and insight she had gained there. She said she was willing to submit to a psychological evaluation if the court deemed it necessary.
In her closing remarks, counsel for DCF urged the trial court to terminate the mother's parental rights, arguing that the "crux" of the case is the mother's steadfast denial that any domestic violence occurred during her relationship with the children's father. She argued that the mother lacks the ability to provide food, clothing, and shelter for her children and has "done nothing toward being self-sufficient" and "an independent person who could adequately protect her children," as shown by the fact that she was living with somebody else and had only saved up $800 despite being gainfully employed for almost a year.
Counsel for the mother countered that no evidence was presented at any time that the mother and father ever had an abusive relationship; the state was asking the mother to admit something that never existed. He argued that the mother has taken responsibility for the prior abuse to the sibling child and, with respect to her newborn children, has taken significant steps on her own initiative to become a better and more protective parent. He also pointed out that a parent and her children can live as a family unit in a home with someone else who, like Laura Flanagan, is willing and able to provide a family support system. In sum, he argued that DCF had failed to meet its burden of proof for termination of the mother's parental rights.
After the hearing concluded, the trial court determined that DCF established by clear and convincing evidence the allegations set forth in the TPR petition and entered a judgment terminating the mother's parental rights to the two children and permanently committing the children to *501 DCF for adoption. The court found that the children's uncle and aunt are available as a permanent custody arrangement and that they wish to adopt them. The court determined that there are no less restrictive means legally available to establish permanency for the children other than termination of parental rights. In determining that termination of parental rights was appropriate, the court found that the mother lacked the ability to provide the twins with food, clothing, medical care, and other material needs. It also found that the mother lacked "the capacity to ensure [that] the safety, well-being, physical, mental, and emotional health will not be endangered upon the children's return to the parental home."
The court went on to state that "[i]t is troublesome to this Court that someone is still not truthful as to how the infant child of [A.H.] and [J.J.] sustained 29 broken bones," and that "[n]o parent has taken responsibility for what happened." The court also explained that, despite finding the testimony of the Women In Distress counselor compelling as to the insight gained by the mother from counseling, it found that the mother was not in a position to ensure the safety of the children. The court further found that the children would not suffer any harm if the mother's parental rights were terminated because they presently reside with their sibling, and the caregivers appear to have fostered a close relationship with all of the children. The court further found that the children have been in a stable pre-adoptive family home for a year since birth and, that if the twins were removed from their current placement, separation of the siblings would cause them harm. The mother appeals the final judgment terminating her parental rights.
Section 39.806(1)(i) authorizes termination of parental rights to a child when parental rights to the child's sibling have been terminated involuntarily. Section 39.806(1)(f) authorizes termination of parental rights when evidence establishes that "the parent or parents engaged in egregious conduct or had the opportunity or capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling." When termination of parental rights is sought because of a prior involuntary termination of rights to a sibling, DCF must prove by clear and convincing evidence that there is a substantial risk of significant harm to the current child, and that termination of parental rights is the least restrictive means of protecting the child from harm. Florida Dep't of Children & Families v. F.L., 880 So.2d 602, 609 (Fla.2004). Similarly, where termination of parental rights is sought based on egregious abuse of a sibling child pursuant to section 39.806(1)(f), DCF must prove that reunification with the parent poses a substantial risk of significant harm to the current child and that termination is the least restrictive way to protect the child. D.O. v. S.M., 981 So.2d 11, 19 (Fla. 4th DCA 2007).
In this case, the parties stipulated to a prior involuntary termination of the mother's rights to the sibling, A2.H. Further, the record showed that the prior termination was based upon a trial court's finding by clear and convincing evidence that the mother engaged in egregious conduct with respect to the sibling. The mother argues, however, that DCF failed to prove by clear and convincing evidence that she poses a substantial risk of significant harm to her twin children and that termination of her parental rights is the least restrictive means of protecting them from harm. We agree.
*502 In F.L., the Florida Supreme Court discussed the evidence a trial court should consider when determining whether a current child is at substantial risk of significant harm and whether termination of rights is the least restrictive means of protecting the child. F.L., 880 So.2d at 610. The court explained that "if the parent's conduct that led to the involuntary termination involved egregious abuse or neglect of another child, this will tend to indicate a greater risk of harm to the current child." Id. at 610. The court added, however, that the amount of time that has passed since the prior involuntary termination is relevant in assessing the current risk. Id. The court also instructed the trial court to consider evidence of any change in circumstances, explaining that "[w]hile a parent's past conduct necessarily has some predictive value as to that parent's likely future conduct, positive life changes can overcome a negative history." Id.
Here, the multiple injuries inflicted at various times upon the sibling child, A2.H, clearly demonstrated egregious abuse. This previous abuse was highly relevant in these termination proceedings because it tended to indicate a greater risk of harm to the current children. However, five years have passed since the prior involuntary termination. And although F.L. makes it clear that a parent is not required to show evidence of changed circumstances to avoid a termination of rights under section 39.806(1)(i), F.L., 880 So.2d at 610, the mother presented evidence of positive changes in her circumstances. Further, the fact that the mother failed to admit to perpetrating the abuse was not pertinent to assessing the current risk. It is not appropriate to base termination of parental rights on testimony that a parent has failed to admit to abuse. See J.F. v. Dep't of Children & Families, 890 So.2d 434, 440 (Fla. 4th DCA 2004) (citing A.C. v. Dep't of Children & Families, 798 So.2d 32, 35 n. 2 (Fla. 4th DCA 2001) and D. Children v. Dep't of Children & Family Servs., 820 So.2d 980, 985 n. 6 (Fla. 4th DCA 2002)). In addition, the trial court's finding that the mother lacked the financial resources to provide the children with food, clothing, and other necessities is not a sufficient basis for terminating her rights. Factors related to a parent's lack of financial resources cannot support permanent termination of parental rights. See Padgett v. Dep't of Health and Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991).
As mentioned above, factors that can weigh against finding a substantial risk of harm to current children include the passage of time and positive changes in a parent's circumstances. In this case, the mother successfully completed the terms of her five year probation and voluntarily enrolled in group and individual counseling at Women In Distress. According to her counselor, she was a highly motivated and active participant in the counseling sessions and parenting classes. The mother obtained full-time employment and housing for herself and the children. She stopped living with the children's father and declared her intention to sever their relationship. The mother also testified that she intends to continue counseling and will submit to a psychological evaluation if requested.
DCF failed to present any evidence that the mother suffers from any mental illness, drug addiction, or other impairments that would cause her to be a danger to her children or render her incapable of reestablishing a relationship with them. DCF essentially argued that the severity of the injuries to the sibling child, A2.H., was sufficient to find that there was a substantial risk of significant harm to the twins. *503 According to DCF, there was no basis to believe that the twins would be safe in the mother's care and "not suffer the same fate visited upon their older sister." Based on the evidence presented at the hearing, however, DCF did not meet its burden to show that the twins are at a substantial risk of significant harm.
Moreover, DCF failed to show that termination of parental rights is the least restrictive means available to protect the current children from harm. As mentioned above, DCF expedited these termination proceedings and did not offer the mother a case plan for the present children. Rather, the mother initiated her own case plan and underwent counseling to improve her parenting skills. DCF did not obtain a psychological evaluation of the mother to assist the court in evaluating the mother's present mental or emotional condition and likelihood of prospective abuse. In short, the mother has not been afforded opportunities to prove her ability and capacity to care for her children and protect them from harm. See J.F., 890 So.2d at 442. As in D.O., the least restrictive means in this case were those that offered the mother "a case plan and time to comply with the plan so as to obtain reunification with the child." D.O., 981 So.2d at 19 (quoting Padgett, 577 So.2d at 565).
Because we reverse the judgment terminating the mother's parental rights to the twins due to DCF's failure to prove that the mother poses a substantial risk of significant harm and that termination is the least restrictive means, we need not discuss the trial court's finding concerning the manifest best interests of the children. We remand this cause to the trial court for continuation of the children's dependency status, formulation of a case plan for the mother, and for further proceedings consistent with this opinion.
Reversed and Remanded.
HAZOURI, J., concurs specially with opinion.
MAY, J., concurs specially with opinion.
HAZOURI, J., concurring specially.
I concur and write only to emphasize my belief that DCF acted too quickly in seeking termination of J.J.'s parental rights. In face of all of the efforts that J.J. has made to rehabilitate herself, I would expect that DCF would have offered a case plan before seeking termination of J.J.'s parental rights.
J.J.'s past conduct continues to haunt her and although past conduct can be a predictor of future conduct, there is clear evidence that she has made substantial progress in improving her parental skills. With the continued dependency and the monitoring of a case plan, DCF and the trial judge will have more current evidence of whether J.J. can be trusted to care for these children. Should J.J. fail to satisfactorily complete her case plan then termination of parental rights would be appropriate. In the meantime, the children will be fully protected from abuse, and the goal of reunification can be pursued.
MAY, J., concurring specially.
I agree with the majority that the Department of Children and Families [DCF] failed to prove that termination of the mother's rights was the least restrictive means to protect the current children from harm. In my view, however, the egregious nature of the harm suffered by their sibling, the unexplained 29 fractures of a three-month old child's arm, ribs, and skull, should be sufficient to establish the requisite basis for the termination of parental rights under 39.806(1), Florida Statutes (2007).
*504 I further acknowledge that we have previously reversed an involuntary termination of parental rights that was based upon the mother having been convicted of, and having served prison time for, manslaughter and child abuse of a stepchild. See J.F. v. Dep't of Children & Families, 890 So.2d 434 (Fla. 4th DCA 2004). Nevertheless, I find J.F. distinguishable for several reasons.
First, the prior incident in J.F. involved a stepchild. Here, the injuries were to the mother's own child. Second, J.F. involved a single unexplained injury to the abdomen that resulted in the child's death. Here, there is no explanation of how the three-month old sustained 29 fractures. Third, the mother in J.F. appears to have served six years in prison for the child's death. Fourth, DCF provided a case plan for the mother in J.F. following her release from prison and the mother complied with the case plan to the best of her ability. Here, no case plan was offered. And sixth, a neuropsychological study reported that the mother in J.F. was capable of re-establishing a relationship with her own child and did not appear to be dangerous to her own children. For these reasons, I do not find J.F. compels us to find the evidence in this case insufficient to establish the statutory basis for the termination of rights.
I also believe however that people can change, and it appears that the mother in this case has taken important steps to do so. It is for this reason, that I agree that there were less restrictive means to insure the protection of the newborn twins. I therefore concur in the ultimate outcome to reverse and remand, but disagree with the majority's holding on the sufficiency of the evidence of the risk of harm to the children.
NOTES
[1] Because the father and the injured child have the same initials, the father will be referred to as A.H. and the child as A2.H.
[2] A.J.C. has a different biological father, H.C., who executed a voluntary surrender of his parental rights.
[3] The parents appealed the termination of parental rights judgment. We per curiam affirmed the father's appeal and sua sponte dismissed the mother's appeal for failure to comply with orders in her appeal.