DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**V.S.,** the Mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES**
and **GUARDIAN AD LITEM,**
Appellees.

No. 4D20-1833

[June 9, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Alberto Ribas, Jr., Judge; L.T. Case No. 19-3330 CJ-DP.

Albert W. Guffanti of Albert W. Guffanti, P.A., Miami, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General of the Office of the Attorney General, Children's Legal Services, Fort Lauderdale, for appellee Department of Children and Families.

Thomasina F. Moore, Statewide Director of Appeals, and Samantha Costas Valley, Senior Attorney of the Florida Statewide Guardian ad Litem Office, Tallahassee, for appellee Guardian ad Litem.

PER CURIAM.

The mother appeals the termination of her parental rights to her four children based upon egregious conduct toward her thirteen-month-old child, egregious conduct being a ground for termination in section 39.806(1)(f), Florida Statutes (2020). She argues that the Department of Children and Families ("the Department") did not prove this ground for termination by clear and convincing evidence. She also claims that the statute is, in part, unconstitutional because it eliminates proof of a nexus between the egregious acts to one child and substantial risk of significant harm to the child's siblings.

As to the mother's first claim, because an appellate court cannot reweigh the evidence presented, and competent substantial evidence

supported the ground for termination of parental rights to the child K.M.4, all three panel members agree with an affirmance.

As to the second claim involving the termination of parental rights to K.M.4's three siblings, a two-judge panel majority determines that the statute is not unconstitutional. The majority further determines that the trial court properly applied the statute as amended in 2014, and concludes that (1) the mother engaged in "egregious conduct . . . that threatens the life, safety, or physical, mental, or emotional health of . . . the child's sibling[s,]" a ground for termination of parental rights found in section 39.806(1)(f), and (2) that termination of the mother's parental rights of the siblings is the least restrictive means of protecting them from serious harm.

Finally, all three panel members agree that the case is to be remanded to have the trial court decide and make findings whether it is in each sibling's manifest best interest to terminate the mother's parental rights.

## Background

At the time of the incident, the mother lived with her four children: a seven-year-old girl ("K.M.1"); five-year-old boy ("K.M.2"); two-year-old boy ("K.M.3"), and a one-year-old boy ("K.M.4"). The maternal grandmother also lived with them.

The Department filed a verified petition for dependency and a petition to shelter the children based upon injuries suffered by K.M.4 while in the mother's care: two left femur fractures, a rib fracture, and a chest injury. These were revealed when the mother took K.M.4 to the emergency room the morning after the alleged incident. A child protective investigator was called to investigate. She interviewed the mother at the hospital and then interviewed the other children.

Later, a Child Protection Team ("CPT") nurse examined K.M.4 and found positive indicators of physical abuse. The nurse determined that the injuries on the child were "inflicted" and that the mother could not "provide any explanation regarding the child's injuries." The trial court granted the shelter petition, finding probable cause to believe that the children were abused, abandoned, neglected, or facing impending danger. The children were placed in the custody of the father, who is not married to the mother, and the mother was given supervised visitation.

Subsequently, the Department filed an expedited termination of parental rights petition against the mother, pursuant to section

39.806(1)(f), Florida Statutes (2020), on the grounds that she engaged in egregious conduct threatening the life, safety, or physical, mental or emotional health of the child or his siblings. The mother denied the allegations, and the case proceeded to trial.

At trial, the mother testified that on the evening of the incident she left K.M.4 in his playpen when she went to the bathroom. While still in the bathroom, she heard K.M.4 scream. As soon as she finished, she went straight to the child and picked him up. She noticed a red spot on his leg but saw no swelling or bruising. Because he was crying, she took him downstairs, gave him a chewable Tylenol, elevated his leg, and put ice on it. He went to sleep, and she slept on the floor next to him. He slept through the night.

When the mother awoke the next morning, she realized that K.M.4's leg was swollen and decided to take him to the hospital. At the hospital, the doctors diagnosed a fracture and then transferred the baby to Plantation General Hospital, where a body scan revealed other injuries. The mother testified that she did not know how the baby could have been injured. She speculated that K.M.3, her two-year-old, may have jumped into the crib onto K.M.4 but got out when K.M.4 cried, because she observed K.M.3 running out of the bedroom just after K.M.4 started crying.

The child protective investigator testified she commenced her investigation after receiving a report of a bone fracture on the child. She spoke to the mother at the hospital and confirmed that what the mother told her at the hospital was consistent with her trial testimony as to the occurrence. The investigator also interviewed K.M.1 and K.M.2. Their stories were not entirely consistent, nor were they consistent with the mother's. However, both placed blame on K.M.2, the five-year-old. K.M.2 admitted to the investigator that he tried to pick up K.M.4 and then dropped him, and the investigator testified that there was nothing about his demeanor to suggest that he was not being truthful with her.

A CPT case coordinator testified she too had interviewed the mother, whose statements were consistent with her trial testimony. Further, a CPT nurse practitioner testified she examined K.M.4 at the hospital and obtained his medical records. She also took a statement from the mother, which again was consistent with the mother's trial testimony.

The nurse practitioner's review of K.M.4's medical records and imaging reports indicated physical abuse. The child had a fracture of the corner of his left femur, which attaches to part of the hip. This fracture is indicative of abuse. He also had a spiral fracture across the same femur. In addition,

he had a rib fracture, and a chest injury called a pneumomediastinum, which is air trapped underneath the chest wall and is usually caused by a direct impact. The nurse did not feel the mother's explanation that one of the other children may have jumped on top of the baby in the playpen was consistent with his injuries. She stated that the corner fracture in particular raised a red flag because these fractures are indicative of intentional injuries and "are usually not accidental." The nurse thought that another child could not have caused the injuries by jumping on the baby or dropping the baby, stating either scenario was "highly unlikely."

The CPT medical director, a pediatrician, testified to his review of K.M.4's medical records and confirmed the child's various injuries. He concluded the injuries were inflicted and not accidental. The injuries were not consistent with any of the explanations given by the mother or the other children, nor did he think that children could exert sufficient force to cause all the injuries. And while some of the injuries could occur accidentally, the totality of the injuries indicated abuse.

The child advocate and guardian ad litem both testified. Each acknowledged that the children and mother had a strong bond and that the mother continued to visit and support the children. The child advocate noted, "[e]very time they see Mom, they're always in a happy mood." The mother had provided food and money to the father for his rent and their care. Nevertheless, the child advocate and guardian ad litem each recommended termination of the mother's parental rights to the children because of the injuries to K.M.4 and their concern that caring for all four children overwhelmed the mother.

Testimony also revealed no prior reports of physical abuse. While the mother and father had been involved in some domestic violence earlier, those incidents stopped when the father moved out of the home long before this incident. The father testified he had seen the mother "whoop" the children, but he never observed any abuse. He was concerned, however, for the welfare of the children because of K.M.4's injuries.

The court entered a final judgment terminating the mother's parental rights as to all four children. The court found the mother's testimony was not credible. The mother was K.M.4's caregiver, and neither the grandmother nor the father was with the child at the time of the incident. The court accepted the nurse's and doctor's findings that the injuries were intentionally inflicted and were not an accident because the injuries required a large amount of force which could only come from an adult, not a child. Therefore, the court accepted the experts' testimony that rejected the explanation that the other children somehow caused the injuries.

4

Given the mother's caretaker role, the court determined she had engaged in "egregious conduct" threatening the child's life, safety, physical, mental, or emotional health. While no evidence was presented of abuse to the other children, the court noted section 39.806(1)(f) does not require proof of any nexus between egregious conduct toward K.M.4 and harm to his siblings.

The trial court further found that because the Department had proved termination pursuant to section 39.806(1)(f), it was not required to use reasonable efforts to reunify the siblings with the mother. Thus, termination was the least restrictive means to protect the children.

Finally, in determining the children's manifest best interests, the court addressed the enumerated factors under section 39.810(1)–(11), Florida Statutes (2020). The court found the children were living with the father, who was providing them with a stable and appropriate placement. Additionally, the court noted the mother had the ability to provide for the children's needs and ensure they had stable housing and a family support system. The mother continued to provide financial assistance to the father while the children were in his care.

However, the trial court found the mother did not have the capacity to ensure the children's well-being. This finding was based solely on the egregious abuse which the court found as to K.M.4. The court specifically stated that it did not have to evaluate potential harm to the other children because proof of a nexus was not required by statute.

The court acknowledged the strong bond between the children and the mother but determined this did not outweigh the fact that the children would be in a more stable environment with the father, particularly because the mother and father communicate effectively. The court expected that the father would foster a relationship between the mother and children post-termination. Despite this, the court also found little or no evidence to support the re-establishment of a parent/child relationship, discussing the abuse suffered by K.M.4, which threatened his life and health. Again, the court did not make findings as to the other children because it concluded no nexus was required.

Accordingly, the court terminated the mother's rights to all the children, having found termination was in the best interests of the children and the least restrictive means of protecting them from harm. This appeal of the final judgment followed.

5

**Analysis**

"The standard of review of the final judgment terminating parental rights is whether the trial court's finding that there is clear and convincing evidence to terminate parental rights is supported by competent, substantial evidence." *T.B. v. Dep't of Child. & Fams.*, 299 So. 3d 1073, 1076 (Fla. 4th DCA 2020) (quoting *C.S. v. Dep't of Child. & Fams.*, 178 So. 3d 937, 940 (Fla. 4th DCA 2015)). "The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." *J.F. v. Dep't of Child. & Fams.*, 890 So. 2d 434, 439 (Fla. 4th DCA 2004).

The appellate court has no authority to reweigh testimony and find it credible. *T.M. v. Dep't of Child. & Fams.*, 971 So. 2d 274, 277 (Fla. 4th DCA 2008) (explaining that an appellate court's "task on review is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute [its] judgment for that of the trier of fact" (alteration in original) (quoting *In re Adoption of Baby E.A.W.*, 658 So. 2d 961, 967 (Fla. 1995))). Nevertheless, termination of parental rights should not be based on speculation. *See M.C. v. Dep't of Child. & Fams.*, 186 So. 3d 74, 80 (Fla. 3d DCA 2016).

The termination of parental rights involves a three-step process. First, a trial court must find by clear and convincing evidence that at least one statutory ground under section 39.806 has been established. *S.M. v. Fla. Dep't of Child. & Fams.*, 202 So. 3d 769, 776 (Fla. 2016). Next, the court must evaluate the relevant factors enumerated in section 39.810, Florida Statutes, to determine whether termination is in the manifest best interests of the child. *Id.* at 776–77. Once the court finds termination appropriate, the court must then determine whether the Department established that termination is the least restrictive means to protect the child from serious harm. *Id.* at 777.

**A. Sufficiency of the Evidence to Prove Egregious Conduct with respect to K.M.4**

In this case, the Department alleged one ground for terminating the mother's parental rights to her children based on section 39.806(1)(f). That section provides:

> (1) Grounds for the termination of parental rights may be established under any of the following circumstances:

6

. . . .

(f) The parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling. Proof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required.

. . . .

The trial court ultimately concluded that the mother intentionally caused K.M.4's injuries, thus providing a ground for termination under this section. As part of its finding, the trial court credited the mother's testimony that she was K.M.4's primary caregiver at the time the injuries occurred and that he was not left alone in the care of another adult. The trial court otherwise found many inconsistencies in the mother's testimony and that her testimony was not credible. Also, given the medical testimony regarding the extent of K.M.4's injuries and the testimony that the injuries could not have been caused by the other children, the trial court concluded it was the mother who abused K.M.4.

On appeal, the mother argues she was consistent in recounting her version of events and that the inconsistencies cited by the trial court were unrelated to the actual incident. While her core explanation of how she thought the incident occurred was consistent, other facts to which she testified were not consistent with other witness testimony. And the trial court can accept or reject her testimony in whole or in part. *See Durousseau v. State*, 55 So. 3d 543, 560 (Fla. 2010) ("[T]he trial court may accept or reject the testimony of an expert witness just as the judge may accept or reject the testimony of any other witness." (alteration in original) (quoting *Roberts v. State*, 510 So. 2d 885, 894 (Fla. 1987))).

The mother also challenges the doctor's opinion as based on speculation. While the doctor did concede that dropping K.M.4 could cause some of the injuries, he steadfastly opined that all the injuries could not have resulted from the explanations offered by the mother or children. This is not speculation but the application of the witness's expertise in evaluating the child's injuries. It was the trial court's role to decide the credibility of the mother's testimony and the reliability of the expert's opinion. *Id.*

The mother essentially asks this court to reweigh the evidence, which is not the appellate court's function. *See T.M.*, 971 So. 2d at 277. "In

reviewing termination orders, we must affirm unless the order is not supported by substantial competent evidence to support the trial court's finding of 'clear and convincing' evidence." *R.S. v. Dep't of Child. & Fams.*, 831 So. 2d 1275, 1277 (Fla. 4th DCA 2002) (citing *In re Adoption of Baby E.A.W.*, 658 So. 2d at 967). Therefore, even if we may have viewed the evidence differently had we been the trier of fact, we must defer to the trial court's findings and conclusions that the mother had engaged in egregious abuse of K.M.4. Thus, we affirm the termination of parental rights as to K.M.4.

## B. Constitutionality of the 2014 amendment to Section 39.806(1)(f), Florida Statutes (2020), as applied to the termination of parental rights with respect to K.M.4's siblings.

As grounds for termination of the mother's parental rights to her other children, the statute provides that "[p]roof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required." § 39.806(1)(f), Fla. Stat. (2020). The Legislature added this sentence to the statute in 2014. Ch. 14-224, §19, at 41, Laws of Fla. The mother contends the added language removing the nexus requirement renders the statute unconstitutional on its face. A facial challenge to the constitutionality of a statute may be raised for the first time on appeal. *See Trushin v. State*, 425 So. 2d 1126, 1129 (Fla. 1982); *In Interest of D.M.*, 616 So. 2d 1192, 1192 (Fla. 4th DCA 1993). A challenge to the constitutionality of a statute is a pure question of law, subject to de novo review. *D.M.T. v. T.M.H.*, 129 So. 3d 320, 332 (Fla. 2013).

The "manifest best interests" inquiry ensures the continuation of an individualized approach and the consideration of all relevant circumstances with respect to sibling terminations, even in circumstances in which the trial court has determined that the parent "[e]ngaged in egregious conduct . . . that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling." § 39.806(1)(f), Fla. Stat. (2020); *see also S.M. v. Dep't of Child. & Fams.*, 202 So. 3d 769, 776–77 (Fla. 2016) (a termination of parental rights petition must contain facts supporting *three* basic elements: (a) at least one of the grounds listed in section 39.806 has been met; (b) the manifest best interests of the child would be served by the granting of the petition; and (c) "termination is the least restrictive means of protecting the child from harm"). Thus, once the petitioner establishes a statutory ground for termination (section 39.806(1)(f) here), it still must address the manifest best interests inquiry.

The mother has not established that section 39.806(1)(f), post-2014 amendment, is unconstitutional. When a statute seems to infringe on a

fundamental liberty interest, it is subject to strict scrutiny to determine whether the statute serves a compelling state interest and does so through the least intrusive means. *Beagle v. Beagle*, 678 So. 2d 1271, 1276 (Fla. 1996); *Dep't of Child. and Fams. v. F.L.*, 880 So. 2d 602, 607 (Fla. 2004). A statute should be construed so as not to conflict with the Constitution. *F.L.*, 880 So. 2d at 607; *see also Abdool v. Bondi*, 141 So. 3d 529, 538 (Fla. 2014) ("Generally, when we review the constitutionality of a statute, we accord legislative acts a presumption of constitutionality and construe the challenged legislation to effect a constitutional outcome when possible.").

Here, the challenged legislation serves a compelling state interest. Section 39.806(1)(f)2., Florida Statutes (2020), defines egregious conduct as "abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child." § 39.806(1)(f)2., Fla. Stat. (2020). As noted in *Interest of C.E.*, 263 So. 3d 202 (Fla. 2d DCA 2019), for a single occurrence to constitute "egregious conduct" under this statute, the incident must be of such severity as to endanger the life of the child. *Id.* at 212. The 2014 amendment eliminating the nexus requirement embodies a legislative recognition that egregious conduct toward one child not only threatens the life and safety of the child's siblings, but also threatens their "physical, mental, or emotional health[.]" § 39.806(1)(f), Fla. Stat. (2020).

As the guardian ad litem's brief notes, the amendment is:

> eviden[ce that] the legislature has determined there is some parental conduct that is so deplorable and so outrageous—like, for example, numerous broken bones in a baby incapable of walking—it poses a risk to *all* the parent's children, not just the child who happens to be the direct recipient of the abuse.

(emphasis in original).

For the statute to pass constitutional muster, it must be narrowly tailored to implement that interest. Judge Warner's dissenting opinion relies heavily on pre-2014 opinions of the Florida Supreme Court: *Padgett v. Department of Health & Rehabilitative Services*, 577 So. 2d 565 (Fla. 1991), and *Dep't of Child. and Fams. v. F.L.*, 880 So. 2d 602 (Fla. 2004). Neither opinion dealt with section 39.806(1)(f) as amended in 2014, nor with a "no nexus required" provision *inserted by the legislature.* Moreover, *Padgett* states that "the permanent termination of a parent's rights in one child under circumstances involving abuse or neglect *may* serve as

grounds for permanently severing the parent's rights in a different child." 577 So. 2d at 571 (emphasis added and footnote omitted). *F.L.* buttresses this point: "Implicit in our decision in *Padgett* is the recognition that *in some cases, but not in all cases*, a parent's conduct toward another child may demonstrate a substantial risk of significant harm to the current child." 880 So. 2d 608 (emphasis added). "Egregious conduct" would appear to fall into the narrow "some cases" category. Thus, the "no nexus required" amendment is *not* incompatible with *Padgett* and *F.L.* or with the "narrowly tailored" prerequisite.

The Second District, in *In Interest of C.M.H.*, 288 So. 3d 722 (Fla. 2d DCA 2018), noted having earlier held that *Padgett*'s "risk-of-harm requirement did not apply to the ground for termination under section 39.806(1)(h), which allows for termination when a parent has caused the death of a child, because '[t]he risk in [that] kind of case is clear.'" 288 So. 3d at 724 (alterations in original) (citing and quoting *In re E.R.*, 49 So. 3d 846, 853 (Fla. 2d DCA 2010)).

*C.M.H.* applied *In re E.R.*'s logic to section 39.806(1)(d)(2), which terminates parental rights for a parent who is incarcerated and has been designated a sexual predator. *See* 288 So. 3d at 724–25. The court rejected the parent's argument that this subchapter of section 39.806(1) should be declared unconstitutional "because it does not require such proof of a substantial risk of significant harm to the child." *Id.* at 723. The court found that *In re E.R.*'s "risk is clear" rationale applies to "the inherent risk of harm associated with sexual predators." *Id.* at 724.

Here, the mother did not argue to the trial court that the conduct could not be considered "egregious" under the statutory definition. Moreover, the final judgment contains a specific finding that the fracture to K.M.4's femur could have resulted in his death. Having determined that competent substantial evidence supports the trial court's finding of egregious conduct with respect to the single episode of life-threatening injuries to K.M.4, we see no reason to not apply the "risk is clear" rationale to the inherent risk of harm associated with such parental behavior as applied to parental rights of the siblings. *See D.O. v. S.M.*, 981 So. 2d 11, 13 (Fla. 4th DCA 2007) (holding that section 39.806(1)(f) "represents a legislative expression that parents who have committed egregious acts of abuse against one child pose an unacceptable risk that they will abuse their remaining children").

**C. Manifest Best Interests**

The trial court also relied on the language eliminating the proof of a nexus in section 39.806(1)(f) in its manifest best interests analysis. Section 39.810(1)–(11), Florida Statutes (2020), requires the court to consider all relevant factors before making a manifest best interests decision. That "manifest best interests" statute *does not* have any provision permitting the trial court to dispense with consideration of factors because of the elimination of proof of a nexus between the egregious conduct to one child and the risk of harm to the siblings of that child. However, two statutory manifest best interests factors could involve some analysis of the impact of egregious conduct by the parent. *See* § 39.810(3) and (4), Fla. Stat. (2020).[1]

Although the trial court sufficiently addressed the pertinent factors in determining that termination as to K.M.4 was in the child's manifest best interests, the court failed to evaluate the mother's capacity to provide for the safety and well-being of her other three children, stating that proof of a nexus between the conduct against K.M.4 and the potential harm to his siblings was not required. The court also applied this same reasoning to find "little to no evidence to support the re-establishment of the parent/child relationship." The trial court merely recited the injuries to K.M.4, and then as to his siblings, simply stated that proof of a nexus between the conduct against K.M.4 and potential harm was not required.[2]

The Department must prove all the elements listed in section 39.810 for the trial court to make the manifest best interests determination. *Interest of C.E.*, 263 So. 3d at 213. The Department failed to offer that proof, apparently taking the same position as the trial court that proof of substantial risk of significant harm to the siblings was unnecessary.

[1] The elimination of the nexus requirement arguably reduces the trial court's scope of analysis as to section 39.810(3), Florida Statutes (2020). However, section 39.810(4), Florida Statutes (2020), requires consideration of "[t]he present mental and physical health needs of the child and such future needs of the child to the extent that such future needs can be ascertained based on the present condition of the child." Thus, recent egregious life-threatening conduct toward one child is one of *multiple* considerations as to present and future physical and mental health needs of the injured child and any siblings. Accordingly, the elimination of a nexus requirement as to statutory grounds for termination does not eliminate the requirement to consider *multiple* aspects of the present and future physical and mental health needs of the injured child and any siblings.

[2] We also note that the trial court was required to make manifest best interest determinations as to each child individually. Here, when making the manifest best interest determinations, the trial court continually referenced "the children," but made no statement confirming that it made the determinations for each child individually, despite use of the group descriptor "the children."

Thus, due to the court's improper reliance on the elimination of the nexus requirement in section 39.806(1)(f), the court erred in failing to conduct a complete manifest best interests analysis with respect to the siblings.

## D. Least Restrictive Means

The Department "must establish in each [termination of parental rights] case that termination of those rights is the least restrictive means of protecting the child from serious harm. This means that [the Department] ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family . . . ." *Padgett*, 577 So. 2d at 571. "However, in cases involving egregious conduct by a parent, 'the termination of parental rights without the use of plans or agreements is the least restrictive means.'" *Interest of C.E.*, 263 So. 3d at 213 (quoting *In re. T.M.*, 641 So. 2d 410, 413 (Fla. 1994)).

As to the siblings, the legislature has abrogated the least restrictive means inquiry for "egregious conduct" cases, among others. *See* § 39.806(2), Fla. Stat. (2020) ("Reasonable efforts to preserve and reunify families *are not required* if a court of competent jurisdiction has determined that any of the events described in paragraphs (1)(b)-(d) or paragraphs (1)(f)-(m) have occurred." (emphasis added)). Accordingly, the trial court here did not consider how the least restrictive means test applied to the children other than K.M.4. Instead, it simply determined that the Department did not have to provide a case plan where the termination was based upon egregious conduct. We find no error.

### Conclusion

Based on the foregoing, we affirm the termination of parental rights with respect to K.M.4. Moreover, the panel majority *does not determine* that the amendment to section 39.806(1)(f), which provides that "[p]roof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required," is unconstitutional or in conflict with pre-amendment precedent. However, the entire panel finds error in the trial court's failure to independently address the manifest best interests of K.M.4's siblings regarding the mother's termination of parental rights. We thus reverse the termination of parental rights as to K.M.1, K.M.2, and K.M.3, and remand for further proceedings as to the manifest best interests determination. If needed, the trial court may conduct further evidentiary hearing(s).

*Affirmed in part, reversed and remanded in part.*

CONNER and FORST, JJ., concur.
WARNER, J., concurs in part and dissents in part with opinion.

WARNER, J., concurring in part and dissenting in part.

I conclude that the 2014 legislative amendment of section 39.806(1)(f), Florida Statutes, is unconstitutional, as it violates a parent's fundamental right to parent by relieving the State of its burden to show that the parent poses a substantial risk of harm to a child, simply by proving an act of egregious conduct towards a sibling. I would reverse on this ground. In addition, the court erred by failing to consider the least restrictive means analysis as to each child. Thus, I dissent in part from the majority opinion.

### Facial Constitutionality of Section 36.806(1)(f)

In *Padgett v. Department of Health & Rehabilitative Services*, 577 So. 2d 565 (Fla. 1991), our supreme court considered the constitutionality of an earlier version of section 39.806(1)(f), which provided that where a parent engages in severe abuse or neglect of one child, termination of the parent's rights to other children was authorized. *Id.* at 571. The supreme court noted that Florida courts had frequently applied the principle that a prior termination of rights to another child can serve as grounds for permanently severing the parental rights to the present child. *Id.* at 569–70. "[T]o require a child to suffer abuse in those cases where mistreatment is virtually assured is illogical and directly averse to society's fundamental policy of preserving the welfare of its youth." *Id.* at 570.

The court then considered the constitutionality of such a principle. It recognized the fundamental right to parent as:

> [A] longstanding and fundamental liberty interest of parents in determining the care and upbringing of their children free from the heavy hand of government paternalism. The United States Supreme Court has concluded that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394, 71 L. Ed. 2d 599 (1982). This interest is especially implicated in proceedings involving the termination of parental rights:
>
> > The fundamental liberty interest of natural parents in the care, custody, and management of their child does

13

> not evaporate simply because they have not been model parents. . . .
>
> *Id.* Florida courts have long recognized this fundamental parental right, as we noted in *State ex rel. Sparks v. Reeves*, 97 So. 2d 18, 20 (Fla. 1957) (citation omitted): "[W]e nevertheless cannot lose sight of the basic proposition that a parent has a natural God-given legal right to enjoy the custody, fellowship and companionship of his offspring. This is a rule older than the common law itself . . . ."
>
> In fact, "the only limitation on this rule of parental privilege is that as between the parent and the child the ultimate welfare of the child itself must be controlling." *Id.*

*Id.* at 570. To satisfy constitutional concerns regarding the fundamental rights involved, based upon abuse or termination of rights to another child, the court held:

> To protect the rights of the parent and child, we conclude that before parental rights in a child can be permanently and involuntarily severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child. . . . The question before us today is whether this abuse, neglect or abandonment must concern the present child, or whether it can concern some other child. Based on our above analysis, we hold that the permanent termination of a parent's rights in one child under circumstances involving abuse or neglect may serve as grounds for permanently severing the parent's rights in a different child.
>
> We note that because parental rights constitute a fundamental liberty interest, the state must establish in each case that termination of those rights is the least restrictive means of protecting the child from serious harm.

*Id.* at 571 (footnotes omitted). Thus, the court created a two-part test for terminating parental rights to a child based upon abuse of a sibling. The State must show: 1) substantial risk of significant harm to the present child, meaning the child whose parent's rights are to be terminated; and 2) termination is the least restrictive means of protecting the child from serious harm.

In *Florida Department of Children & Families v. F.L.*, 880 So. 2d 602 (Fla. 2004), the court addressed another similar statute, section 39.806(1)(i), Florida Statutes (2002), that established a ground for termination "when the parental rights of the parent to a sibling have been terminated involuntarily." *Id.* at 607. Discussing *Padgett,* the court noted:

> Implicit in our decision in *Padgett* is the recognition that in some cases, but not in all cases, a parent's conduct toward another child may demonstrate a substantial risk of significant harm to the current child. In all cases, we emphasized that to pass constitutional muster, the termination of parental rights to the current child must be the least restrictive means of protecting that child from harm.

*Id.* at 608.

Based on *Padgett,* the court agreed that "section 39.806(1)(i) may not constitutionally permit a termination of parental rights without proof of substantial risk to the child." *Id.* at 609. However, the statute could be deemed constitutional by applying the *Padgett* factors to its operation. Thus, the court held:

> We, therefore, hold that parental rights may be terminated under section 39.806(1)(i) only if the state proves both a prior involuntary termination of rights to a sibling *and a substantial risk of significant harm to the current child.* Further, the state must prove that the termination of parental rights is the least restrictive means of protecting the child from harm.

*Id.* at 609–10 (emphasis supplied). Thus, *F.L.* also required proof of substantial risk of significant harm to the child where the ground for termination is based upon the termination of parental rights to a sibling. The court further explained that such a finding must be based upon the specific circumstances of each case:

> For a trial court applying section 39.806(1)(i), the circumstances leading to the prior involuntary termination will be highly relevant to the court's determination of whether the current child is at risk and whether termination is the least restrictive way to protect the child. Specifically, if the parent's conduct that led to the involuntary termination involved egregious abuse or neglect of another child, this will tend to indicate a greater risk of harm to the current child.

*Id.* at 610. Furthermore, in deciding *F.L.*, the court specifically rejected the approach of *A.B. v. Department of Children & Families*, 816 So. 2d 684 (Fla. 5th DCA 2002), which held that the statute created a rebuttable presumption in favor of termination, but a parent could present evidence of a lack of substantial risk of harm to the siblings. *Id.* at 608–09. "The rebuttable presumption stated in *A.B.* would relieve the state of this burden of proof. This burden shifting would violate the constitutional requirements articulated in *Padgett.*" *Id.* at 609.

Our cases following *F.L.* required a nexus between the conduct of the parent toward one child and substantial risk of significant harm to siblings. *See J.F. v. Dep't of Child. & Fams.*, 890 So. 2d 434, 441 (Fla. 4th DCA 2004) ("[I]n order for a termination of parental rights to be based solely on the single act of committing manslaughter or a felony assault against another child, the state must also prove that, based on the totality of the circumstances surrounding the petition, the parent currently poses a substantial risk of significant harm to the current child or children and that termination of parental rights is the least restrictive means of protecting the current child or children from harm."); *see also A.J. v. Dep't of Child. & Fams.*, 97 So. 3d 985, 987–88 (Fla. 4th DCA 2012) (holding that trial court erred in terminating father's rights to sons where there was insufficient evidence of substantial risk of significant harm to sons based upon sexual abuse of daughters and the totality of the circumstances); *J.J. v. Dep't of Child. & Fams.*, 994 So. 2d 496, 502 (Fla. 4th DCA 2008) (holding that termination based upon section 39.806(1)(i) was error where there was no showing of substantial risk of significant harm to later born siblings).

In contrast, the Second District held that in cases of sibling murder, there was no requirement to show a nexus between the murder and substantial risk of significant harm to the remaining children. *See In re E.R.*, 49 So. 3d 846, 853 (Fla. 2d DCA 2010) (certifying conflict with *J.F.*, 890 So. 2d 434). Nevertheless, in *E.R.*, the court found that substantial risk to the remaining children had been proven. *Id.* at 855. The father apparently had killed his infant child, a victim of "shaken baby syndrome." This showed a lack of control by the father, and individuals who engaged in such conduct had a high rate of recidivism, as testified to by a child abuse expert. Thus, the court considered the totality of the circumstances in determining that there was a substantial risk. *Id.* at 854.

With the amendment eliminating the nexus requirement in section 39.806(1)(f), the legislature removed the very factor that *Padgett* and *F.L.* required to make similar statutes constitutional when seeking to terminate parental rights to a child based upon the parent's conduct toward a

sibling. The amendment violates the constitution, because it allows termination of parental rights to a child based upon egregious abuse of the child's sibling without any showing of substantial risk of significant harm to the current child. While in many cases of egregious abuse substantial risk of significant harm may be evident, the foregoing cases show that it is not always present.

The statute creates a presumption that harm to the other child will occur and conflicts with principles espoused in *Stanley v. Illinois*, 405 U.S. 645 (1972), a parental dependency case, in which the Court said:

> Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.

*Id.* at 656–57. While *Stanley* involved the preclusion of an unwed father from a dependency hearing where his children were taken from him, it has also been applied to hold that statutory presumptions which preclude individual decision-making as to whether a parent will cause substantial harm to a child are unconstitutional. In *In re Swanson*, 2 S.W. 3d 180 (Tenn. 1999), the court relied on *Stanley* in holding, "[t]he federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *Id.* at 188 (citing *Stanley*, 405 U.S. at 658–59).

The guardian ad litem points to several cases in which the appellate courts have found that no nexus is necessary when seeking to terminate a parent's rights to siblings based upon abuse of another child. Those cases were either decided prior to *F.L.* or are markedly different in their facts, which shows that each case must be based upon an individual evaluation of all the circumstances.

For instance, in *Department of Children & Families v. B.B.*, 824 So. 2d 1000 (Fla. 5th DCA 2002), decided prior to *F.L.*, the trial court terminated the rights of a father to one of his daughters, because of sexual abuse of this daughter and his claimed religious beliefs that marriage and sex with his daughters was divinely inspired. The trial court did not terminate his rights to his sons or to his other daughter. *Id.* On appeal, the Fifth District determined that the court erred in refusing to terminate the father's rights

17

to his sons and the other daughter, concluding that no nexus between the sexual acts and substantial harm to the other children was required. *See id.* at 1008–09. The court relied on its prior case of *A.B.*, which had created a rebuttable presumption of harm, but which our supreme court rejected in *F.L. Id.* at 1007–08; *see F.L.*, 880 So. 2d at 609. However, the *B.B.* court also explained that, based upon the egregious facts of the case, the sons were also at substantial risk of harm through the father's inculcation of the religious tenets o he claimed allowed him to "marry" his twelve-year-old daughter. *Id.* at 1008, 1002. The boys slept in the same house where he was sleeping with his daughters and were also taught to lie about such subjects to adults. In other words, the court found that there was substantial risk of harm to the sons, even though it was not the same abuse suffered by the daughters. *See id.* at 1008–09.

The majority cites both *In Interest of C.M.H.*, 288 So. 3d 722 (Fla. 2d DCA 2018) and *In re E.R.*, 49 So. 3d 846 (Fla. 2d DCA 2010) in support of its holding. *E.R.* concluded that under section 39.806(1)(h), where a parent murdered one child, the Department did not have to prove a substantial risk of harm to other children, because the risk was apparent. *Id.* at 853. In *C.M.H.*, however, the court applied the *Padgett* substantial harm analysis to section 39.806(1)(d)(2). It concluded that the legislature had not intended to abrogate the substantial harm requirement of *Padgett*, but the harm to all the children of the father being a sexual predator and having been convicted of sexual abuse of a minor was sufficient. Neither opinion analyzed the constitutionality of section 39.806(1)(f), but *C.M.H.* included a footnote important to explain its conclusion that the substantial harm requirement of *Padgett* was not abrogated:

> Rather, the 2014 amendments to the grounds for termination provided in section 39.806(1)(f) (egregious conduct) and section 39.806(1)(h) (causing the death or serious bodily injury of a child) indicate a desire to retain *Padgett*'s risk-of-harm requirement for section 39.806(1)(d)(2). In those amendments, the legislature expressly stated that proof of a nexus between the parent's past conduct and the risk of harm to the child was not required. *See* ch.14-224, § 19, at 41, Laws of Fla. Under the doctrine of *expressiounius est exclusion alterius,* the inclusion of such language in only those two grounds indicates an intention to exclude that language from all of the other grounds, including section 39.806(1)(d)(2). *Cf. Cricket Props., LLC v. Nassau Pointe at Heritage Isles Homeowners Ass'n,* 124 So. 3d 302, 306 (Fla. 2d DCA 2013) (reasoning that the legislature's inclusion of a caveat in one subsection of the statute, but not in another,

indicated that it intended to exclude the caveat in the other subsection). Thus, the amendments indicate that *Padgett*'s risk-of-harm requirement applies to section 39.806(1)(d)(2). *We note that in commenting on these amendments we do not express any opinion regarding their constitutionality, which we have previously called into question. See J.F. v. Dep't of Children & Families*, 198 So. 3d 706, 707 (Fla. 2d DCA 2016).

*Id.* at 724 n.4 (emphasis supplied).

Because the legislative amendment to section 39.806(1)(f) conflicts with the constitutional analysis of *Padgett* and *F.L.*, I would hold that it is unconstitutional, as we are bound to follow supreme court precedent. To protect the fundamental rights of parents, the State must show a substantial risk of significant harm to a child in order to base the termination of parental rights to that child on the abuse of the child's sibling. Here, the trial court relied on the statute, and it did not perform a risk analysis for the siblings of K.M.4.

In this case it is indeed questionable whether there is a substantial risk of significant harm to K.M.4's siblings. How K.M.4 was injured remains uncertain. While the experts stated that the injuries most likely were caused by an adult, neither opined on how they could have occurred. Unlike most other cases, these injuries occurred in one incident. They were not in varying stages of healing, which would indicate ongoing abuse. Furthermore, the injuries were not suggestive of anything like shaken baby syndrome. *See, e.g., In re E.R.*, 49 So. 3d at 849. None of the injuries in this case were life threatening.[3] As to K.M.4's siblings, the case workers found no signs of abuse or inappropriate discipline. There was no evidence that the mother had mental health issues or anger management issues that would endanger the children. There were no ongoing issues with the family. The siblings were strongly bonded to their mother. The evidence was completely lacking regarding a substantial risk of significant harm to K.M.4's siblings. Thus, the statutory elimination of this crucial test may have deprived the mother of her right to parent her other children without the Department ever having to prove that they were at risk in her care. This unconstitutionally violates her fundamental rights.

**Least Restrictive Means**

---

[3] While the doctor testified that a fracture could be life threatening if it pierced an artery, he did not testify that this fracture or any of the other injuries were life threatening. Not every bone fracture constitutes a life-threatening event.

Similarly, in applying the least restrictive means test, the court did not consider how that test applied to K.M.4's siblings. The court simply determined that the Department did not have to provide a case plan where the termination was based upon egregious conduct. *Cf. In Interest of T.M.*, 641 So. 2d 410, 413 (Fla. 1994). But where there is no evidence of substantial risk of significant harm to the siblings, termination is not the least restrictive means of protecting the other children. *See, e.g., A.J.*, 97 So. 3d at 988; *J.J.*, 994 So. 2d at 503. Just as with the manifest best interest analysis, the court improperly relied on the elimination of the nexus requirement in section 39.806(1)(f) to find that termination was the least restrictive means to protect the siblings. The evidence suggested, however, that the siblings were not at substantial risk of significant harm from the mother. There had been no indications of any physical abuse of the siblings at any time. The mother continued to visit with them, and they were happy to see her. She provided the father with significant financial support for them. Because the children are in the custody of the father, they are not lacking in permanency. The court had multiple options, including placing the children in dependency and offering the mother a case plan. There is no showing that termination was the least restrictive means to protect K.M.4's siblings.

## Conclusion

For these reasons, I dissent in part from majority opinion. I concur in the majority opinion as to the termination of the mother's parental rights to K.M.4 and its reversal as to the manifest best interest analysis.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***

20